ELINE REALTY COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 68651. Filed October 7, 1960.

*Charles Speed Gray, Esq.*, for the petitioner.
*Mark H. Berliant, Esq.*, for the respondent.

BRUCE, *Judge:* This proceeding involves a deficiency in Federal income tax for the taxable year ended July 31, 1953, in the amount of $2,440.07. The issue is whether gain realized by petitioner from the sale of certain land is taxable as capital gain or as ordinary income.

#### FINDINGS OF FACT.

The stipulated facts are so found and are incorporated herein by this reference.

Petitioner is a Kentucky corporation with its principal office in Louisville, Kentucky. It filed its income tax return for the year ended July 31, 1953, with the district director of internal revenue for Kentucky.

Petitioner was incorporated on October 15, 1947, and commenced business on November 1, 1947. It was the successor of the business

1

theretofore conducted in partnership by A. J. Eline and Pearl Hartman. The partnership was organized in July 1944, to take over the business previously carried on by A. J. Eline as a sole proprietorship. A. J. Eline has been engaged in the real estate business since 1912.

From the time it commenced business through the taxable year involved herein petitioner had 520 shares of capital stock issued and outstanding. Its stockholders, officers, and directors during such period were as follows:

|  | Shares |
|---|---|
| A. J. Eline, president and director | 259 |
| Alton J. Eline, vice president and director | 1 |
| Pearl Hartman, secretary-treasurer and director | 260 |

As stated in its articles of incorporation, the purpose for which petitioner was incorporated is as follows:

The purpose of the Corporation shall be to buy, own, sell, lease, improve, subdivide and develop real estate for commercial and residential purposes; to buy, own, sell, mortgage and lease personal property; to act as general contractors; to conduct a general real estate business and act as realtor.

In fact, petitioner did conduct a general real estate business and did act as a realtor. It engaged in the sale of residential and commercial properties, the subdivision and development of land, the sale of lots to individuals and contractors, the construction and sale of houses, the listing and sale of real estate on a commission basis, and the rental of apartment buildings.

Petitioner's activities were substantially the same as those of its predecessors, the partnership and the proprietorship.

In 1937, Pearl Hartman, who for many years prior to entering into partnership with A. J. Eline served as his office manager and bookkeeper, acquired legal title to a 16-acre tract of land, hereinafter referred to as the Fehr farm, which was located in Jefferson County, Kentucky, on the outskirts of Louisville. Although Pearl did invest some capital in the farm, in reality it was purchased by A. J. Eline, and, as was on occasion apparently his custom, he had legal title placed in Pearl's name.

When deeded to Pearl, the Fehr farm was bounded on the east by English Village subdivision, section 2; on the north by the Kenbar subdivision; on the west by a 35-acre tract of undeveloped land; and on the south by a 22-acre tract of undeveloped land. Section 2 of English Village, as well as section 1 to its east, had been subdivided and developed by A. J. Eline.

In 1938 A. J. Eline subdivided part of the Fehr farm as English Village, section 3, by extending the existing east-west streets in sections 1 and 2, Norbourne Boulevard and St. Germaine Court, and the

north-south streets of the Kenbar subdivision, Macon Avenue and Thompson Avenue, in the same pattern across the farm.

Another part of the Fehr farm was subdivided in 1947, apparently by the partnership, as English Village, section 4, by further extending Norbourne Boulevard and St. Germaine Court. The development of section 4 and the sale of the lots therein were completed by the petitioner. The last of the platted and subdivided lots from the farm, namely those in section 4, were disposed of by 1949 or 1950.

The continuation of Norbourne Boulevard, a hard-surfaced street, in a straight line from English Village, sections 1 and 2, across the Fehr farm, traversed just above the southern boundary of the farm, thereby isolating from English Village, sections 3 and 4, a narrow strip containing approximately seven-twelfths of an acre. This odd-shaped lot was 1,056 feet long and it tapered from a width of 28.88 feet at its western end to a width of 12.81 feet at its eastern end. Similar in terrain to sections 3 and 4, it was flat and had no distinguishing gullies or hills.

In order to utilize this lot in the development of sections 3 and 4, it would have been necessary to create a deflection in Norbourne Boulevard. This was considered undesirable by the county authorities and by the engineers who mapped the subdivision. The strip was not included in the plats of sections 3 and 4 and it was regarded as useless unless the abutting land to its south was subdivided at some time in the future. Nor was the strip included under the contracts for utility service supplied to sections 3 and 4.

From the time subdivision of the farm was contemplated, it was intended by the petitioner or its predecessors to sell the lot to the owners of the adjoining property to the south. The lot was carried at a nominal cost on its books. Use of the lot for construction or subdivision was not feasible. During the 16 years that the strip was held by the petitioner or its predecessors the land was not subdivided or improved, and it was not advertised for sale or listed with any broker. No "For Sale" signs were placed on it, and no use restrictions were imposed thereon.

In 1945 J. Graham Brown acquired title to the 22-acre tract of undeveloped land which was located to the south of the Fehr farm and adjacent to the entire length of the lot owned by the petitioner. Brown decided to subdivide this 22-acre tract and it therefore became advantageous for him to acquire petitioner's odd-shaped lot. In 1953 petitioner sold the lot to Brown for $10,000. By purchasing this strip of land, Brown acquired frontage for lots facing Norbourne Boulevard and was able to tie in his streets with the existing streets in sections 3 and 4 of English Village and to connect with the water mains serving those sections.

The negotiations leading to the sale of the strip of land to Brown were initiated by Brown through an agent who tendered an offer for the land. No effort had been made by anyone representing petitioner to sell the land to Brown prior to receipt of the offer. Brown's initial offer was rejected, and negotiations continued for several months until Brown finally agreed to pay the $10,000 price asked by petitioner.

In 1954 Brown conveyed title to the odd-shaped lot, to the 22-acre tract of land to its south, and to the 35-acre tract of undeveloped land to the west of the Fehr farm (title to which he had acquired in 1947) to Brown Hotel Farms, a Kentucky corporation organized by Brown in 1946. The 22-acre tract and the odd-shaped lot were subdivided by Brown Hotel Farms as part of Broad Fields in 1955. The 35-acre tract was subdivided by Brown Hotel Farms as a part of Broad Fields, section 2A, in 1958.

On its income tax return for its fiscal year ended July 31, 1953, petitioner reported the gain realized on the sale of the odd-shaped lot as capital gain of $9,722.32, the sales price of $10,000 as reduced by a cost basis of $277.68.

On its balance sheet for the year ended July 31, 1952, petitioner included the cost basis for the lot under the category: "Lots held for sale."

The odd-shaped lot which was isolated from English Village, sections 3 and 4, by Norbourne Boulevard was not held at the time of sale as property primarily for sale to customers in the ordinary course of business.

OPINION.

Respondent has determined that the gain realized from the sale of the odd-shaped lot "is taxable as ordinary income within the purview of Section 22 of the Internal Revenue Code of 1939 [1] inasmuch as said land was held primarily for sale to customers in the ordinary course of [petitioner's] trade or business and therefore was not a capital asset under Section 117 of the Internal Revenue Code of 1939." [2] In support of his determination respondent directs our at-

---

[1] SEC. 22. GROSS INCOME.

(a) GENERAL DEFINITION.—"Gross income" includes gains, profits, and income derived from salaries, wages, or compensation for personal service * * * of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. * * *

[2] SEC. 117. CAPITAL GAINS AND LOSSES.

(a) DEFINITIONS.—As used in this chapter—

(1) CAPITAL ASSETS.—The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

(A) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

tention to petitioner's multifarious activities as a real estate dealer and contends that petitioner's acquisition, holding, and sale of the odd-shaped lot in question was an integral part of such activities.

It is well established that a dealer in real estate may occupy a dual role: He may be a dealer with reference to some of his properties, and an investor as to others. *Charles E. Mieg*, 32 T.C. 1314, 1321; *D. L. Phillips*, 24 T.C. 435; *Walter R. Crabtree*, 20 T.C. 841; *Nelson A. Farry*, 13 T.C. 8. The characterization of any particular asset as one held for sale or as an investment is a question of fact, which is resolved with the aid of certain well recognized tests, among which are: The intent of the seller with respect to the particular asset in question; the purpose for which the property was acquired, held, and sold; the volume, frequency, continuity and substantiality of the sales; the proximity of sale to purchase; and the extent of sales activity on the part of the seller or his agents. These factors must be viewed in light of all the facts; no single factor is controlling. *W. T. Thrift, Sr.*, 15 T.C. 366; *Boomhower* v. *United States*, 74 F. Supp. 997. Moreover, while the purpose for the acquisition must be given consideration, intent is subject to change, and the determining factor is the purpose for which the property is held at the time of sale. *Carl Marks & Co.*, 12 T.C. 1196; *Richards* v. *Commissioner*, 81 F. 2d 369; *Mauldin* v. *Commissioner*, 195 F. 2d 714; *Raymond Bauschard*, 31 T.C. 910, 917, affd. 279 F. 2d 115.

Upon consideration of the instant facts in light of the aforementioned principles, we conclude that the odd-shaped lot sold by petitioner in 1953 was not held "primarily for sale to customers in the ordinary course of his trade or business" and, consequently, gain realized from its sale is taxable as capital gain.

A. J. Eline began to subdivide and develop the Fehr farm soon after acquiring it in 1937. The eastern portion of the farm was subdivided and developed beginning in 1938, the western portion beginning in 1947. During the course of subdivision and development, Norbourne Boulevard, an existing east-west street, was extended in a straight line across the farm, crossing just above its southern boundary, thereby isolating the long and narrow lot in question from that part of the Fehr farm which was being subdivided and developed. In order to have used this lot in the subdivision and development of the Fehr farm, it would have been necessary to deflect Norbourne Boulevard in a more southerly direction. This was not done because it was considered undesirable, both by the county authorities and by the engineers who mapped the subdivision.

From the time that the street pattern became certain, the odd-shaped lot was regarded as useless unless the land adjoining it to the south was subdivided at some time in the future. Its limited size

and narrow dimensions made subdivision, development, or construction unfeasible. In contrast with the subdivision and development activities which occurred with respect to the remaining portion of the Fehr farm, during the 16 years that the lot was held by the petitioner or its predecessors it was not subdivided or improved, was not advertised for sale or listed with any broker, was not included in the plats of sections 3 and 4 of the English Village subdivision, nor was it included under the contracts for utility service applicable to those sections. Moreover, no "For Sale" signs were placed on it and no use restrictions were imposed thereon.

Although A. J. Eline acquired the farm in order to subdivide and develop the whole tract, in our view it is quite clear that as soon as the street pattern crystallized, the purpose for holding the lot changed from one of sale to one of investment. Unable to use the lot for subdivision and development, petitioner realized that there would be only one probable use and only a single potential purchaser. Petitioner's only real hope rested in the possibility that at some future time the owner of the adjoining 22-acre tract would subdivide. Were that to happen, the character of the odd-shaped lot would change from that of an incidental leftover to that of a crucially located and valuable tract of land—valuable to the prospective purchaser, out of all proportion to its cost basis to the petitioner, principally because of its frontage on Norbourne Boulevard and its access to existing streets and utility sources. Petitioner's speculation became fact and the speculative nature of petitioner's investment resulted in handsome gains to the petitioner. Carried at a cost basis of $277.68, the lot was sold for $10,000, at least 3 years after the last of the subdivided and platted lots had been sold. Furthermore, the purchaser was not solicited by petitioner and he met the price set by petitioner after at least one rejection.

The proper treatment of petitioner's subdivision leftover is not entirely free from doubt, especially in view of petitioner's diverse real estate activities and extensive sales as a dealer. Several of the normally applicable tests, such as the extent of subdivision and development activities, are of reduced significance here because the lot was, for all practical purposes, incapable of being subdivided or improved. Likewise, the extent of sales or sales-related activities is not of its usual importance since the instant situation might be considered a seller's market with one solicitous purchaser.

Lacking such objective manifestations as guideposts, our inquiry returns to the basic question of intent: Was the odd-shaped lot "held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business" within the meaning of section 117(a)(1)(A) or was it held "with the hope that an ultimate enhancement in value

would provide the opportunity for profitable disposition"? *Charles E. Mieg, supra* at 1321. We believe that the latter proposition is the case. Petitioner, after the street pattern became clear, held the odd-shaped lot primarily for speculation and investment and not for sale to customers in the ordinary course of its business. Accordingly, respondent's determination cannot be sustained. Due to an uncontested adjustment,

*Decision will be entered under Rule 50.*