Pontchartrain Park Homes, Inc. v. Commissioner.
Pontchartrain Park Homes, Inc. v. Commissioner
Docket No. 94269.
United States Tax Court
T.C. Memo 1963-92; 1963 Tax Ct. Memo LEXIS 255; 22 T.C.M. (CCH) 437; T.C.M. (RIA) 63092; March 28, 1963
Victor A. Sachse, Esq., Fidelity National Bank Bldg., Baton Rouge, La., for the petitioner. Robert S. Leigh, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: A deficiency has been determined by respondent in the income tax of petitioner for the taxable *256 year February 1, 1957 to January 31, 1950, in the amount of $41,585.39. The sole issue is whether in a sale of certain real property petitioner realized capital gains or ordinary income. Findings of Fact The facts which have been agreed upon are found as stipulated. Petitioner was incorporated under the laws of the State of Louisiana on February 12, 1954, and filed its Federal income tax returns for the taxable years ended January 31, 1955, 1956, 1957, and 1958 with the district director of internal revenue, New Orleans, Louisiana. Early in the year 1950 Mayor deLesseps S. Morrison of New Orleans approached W. Hamilton Crawford, well known as a president of companies engaged in the development of residential and commercial properties, relative to a joint undertaking by the City of New Orleans and Crawford for the development of a residential subdivision and municipal park and playground for the Negro population of New Orleans. A tract of land known as the Vincent tract consisting of about 395 acres located near Lake Pontchartrain was available for purchase for this purpose. Under the plans as presented by the Mayor, the City was to purchase the center portion of the Vincent *257 tract, consisting of about 183 acres, for the development of the municipal golf course, playground, and park, and Crawford would purchase the horse-shoe-shaped land of about 211 acres around the perimeter of the City's property for the purpose of subdivision and sale of the houses and lots through financing arranged with the Veterans' Administration and the Federal Housing Administration. The plans also contemplated a joint undertaking by the City of New Orleans and Crawford and his associates relative to the development of a white housing project to be named "Gentilly Village" on a tract of land known as the "Seeger" tract. The Negro subdivision was to be known as Pontchartrain Park. The City of New Orleans adopted an ordinance on April 28, 1950, providing for its obligations under the joint undertakings. The terms and conditions of the contract for the development of the two housing projects were set forth in a letter from the developers, "Crawford, Tessier, and Toups," dated April 15, 1950, addressed to the Mayor of the City of New Orleans, and a letter, dated April 27, 1950, addressed to Crawford, Tessier, and Toups, c/o Crawford Corporation, Baton Rouge, Louisiana, signed *258 by the Mayor. Pursuant to its undertaking for the development of Pontchartrain Park subdivision under the contract, the City of New Orleans agreed to: clear, grade, and grub all streets and alleys from curb to curb; perform all necessary excavation required for construction of streets; provide sand, shells, or other temporary surfacing material, labor by contract, or otherwise, to construct the streets; provide and install street name signs, street lights, provide garbage collection and fire protection service; maintain the streets; arrange for the conveyance to Crawford, Tessier, and Toups, or to a corporation designated by them of that part of the Vincent tract not to be used by the City for a public park. Pursuant to their undertaking under the contract for the development of Pontchartrain Park subdivision, the developers agreed if, as, and when such development took place to: provide necessary storm water drainage, concrete curbs, gutters, and sidewalks under a cost participating agreement with the Sewerage and Water Board of New Orleans; dedicate the streets and alleys of the subdivision to the public; secure final approval of the preliminary plan of Pontchartrain Park by *259 the City Planning and Zoning Commission and other required agencies of the City of New Orleans; and secure firm commitments from the Veterans' Administration and Federal Housing Administration for houses to be built in the subdivision. Under the contract, the developers were not to bear any expense for any item within the confines of the park area of the Pontchartrain Park subdivision, nor were they to stand the expense of curbs, gutters, or sidewalks for that side of the street separating the park from the housing subdivision which lay on the park side of the street. However, the entire cost of street surfacing of this borderline street was included in the City's commitment. On or about June 30, 1950, the City of New Orleans purchased the center portion of the Vincent tract consisting of 183.59 acres for a consideration of $173,963.09. In January 1951, Crawford and his associate Toups purchased the perimeter land consisting of 211.3908 acres (hereinafter for convenience referred to as 211 acres) for a consideration of $195,036.91. A preliminary plan for the development of Pontchartrain Park subdivision was prepared as of October 29, 1952, by the firm of F. C. Gandolfo and *260 Associates, showing it was contemplated the entire 211-acre tract was to be subdivided into streets and lots, provision also being made for a public school site and a shopping center site. As of November 9, 1953, Gandolfo prepared an additional preliminary plan for filing with the City Planning Commission of New Orleans showing the proposed development of the 211 acres in subdivision form. This plan was given tentative approval by the City Planning Commission of New Orleans on November 25, 1953. On February 12, 1954, Crawford and Toups procured the formation of the petitioner corporation, Pontchartrain Park Homes, Inc., through nominees for the purpose of acquiring the 211 acres from Crawford and Toups and to take over the development of the tract. However, all shares of the petitioner were owned by Crawford and Toups. The Articles of Incorporation of petitioner provided that - The objects and purposes for which this Corporation is organized, and the nature of the business or business to be carried on by it, shall be to buy, own, improve, rent, lease and sell home sites, building sites, houses, garages, and other types of buildings for itself or on behalf of others; to construct *261 for itself as owner or for others as contractor any and all types of buildings and in general to have and enjoy all of the authority conferred upon corporations organized for profit under Act No. 250 of the Legislature of Louisiana for the year 1928, as amended. Crawford and Toups, who owned all of the stock of petitioner from its organization, were residents of Baton Rouge, Louisiana. On July 1, 1954, the Articles of Incorporation of petitioner were amended to provide for the investment in and ownership of one-half of petitioner's stock by Edgar B. Stern and Charles Keller interests in New Orleans. By this amendment, the corporation was to be in existence only for a period ending September 30, 1957. By later amendment, however, the petitioner's corporate life was extended. On July 6, 1954, petitioner entered into an agreement to purchase the 211 acres of land from Crawford and Toups, who were named in the City Ordinance referred to above and who had purchased the property January 12, 1951. The City of New Orleans agreed that Pontchartrain Park Homes, Inc., would take over the prior undertaking of Crawford and Toups. The City of New Orleans agreed to bear a part of the costs *262 of the development of the 211 acres after the purchase by Pontchartrain Park Homes, Inc. During 1954, petitioner made plans to develop the 211 acres by four sections, beginning with Section 1 on the northeastern end of its perimeter land. It arranged for a survey, entered into contracts for clearing and draining the land, and negotiated with the City of New Orleans as to the extent of the City's participation in the costs of development. The plans called for the subdivision of Section 1, consisting of 50.643 acres, into 267 lots with streets; Section 2, consisting of 65.458 acres, into a public school site of 8.65 acres and 307 lots with streets; Section 3, consisting of 68.8 acres, into a shopping center site of 5.97 acres and 328 lots with streets; Section 4, consisting of 26.49 acres, into 113 lots with streets. The total number of finished residential lots envisaged under the plans was 1,015. The final closing of the sale of the 211 acres to petitioner was had on or about January 5, 1955. The consideration to Crawford and Toups for this sale was at $4,000 per acre or a total amount of $845,563.20. On January 27, 1955, the City of New Orleans adopted another ordinance authorizing *263 the Mayor to enter into a contract with petitioner relative to the joint development of Pontchartrain Park subdivision. The terms and conditions of the proposed contract or contracts were set forth in a letter signed by the Mayor of the City of New Orleans, as such Mayor, and as President of the Sewerage and Water Board of New Orleans, addressed to petitioner, dated November 18, 1954, a reply thereto from petitioner, dated December 6, 1954, and the confirming letter of the Mayor, dated December 10, 1954, a copy of each letter being annexed to the ordinance as adopted. The letter of Mayor deLesseps S. Morrison, dated November 18, 1954, reads as follows: On April 28, 1950 the City of New Orleans adoped [adopted] Ordinance No. 17801 CCS, providing for the co-operation of the City in the development of a housing project on the tract of land then known as the Seeger Tract, now known as Gentilly Woods, and one for the development of another housing project including a large park to be located in the tract known as the Vincent tract. Your Corporation has purchased from Messrs. Crawford and Toups, named in the ordinance, the tract which adjoins the said park on three (3) sides, and *264 contemplates the development of the tract 210 acres for housing during the calendar years 1954, 1955 and 1956. The development of the property by your Corporation will include park perimeter streets and drainage. This drainage will provide a major portion of the drainage required for the park area. Accordingly, and to enhance access thereto, the City of New Orleans, with the approval of its Council, will enter into an agreement with Pontchartrain Park Homes, Inc., as follows, to-wit: 1. The subdivider will from time to time file plats showing the portion of said acreage to be developed and will then dedicate streets and servitudes necessary for the public and for public utilities, all in conformity with applicable ordinances and regulations of the City of New Orleans and of the Sewerage and Water Board of the City of New Orleans. 2. By reason of the fact that the City is an abutting property owner and has previously, agreed to bear its proportionate cost, particularly, of the park perimeter streets and the drainage serving such streets, and for the additional reason that the amount of contribution made herein are within the policies heretofore expressed with respect to subdivisions, *265 the City will contribute to the developers, during the calendar years 1955 and 1956, the sum of $360,657.00 for the whole project. This $360,657.00 will be the City's portion of the necessary street construction and is made up as follows: Clearing, grubbing and grad-
ing streets
$ 57,500.00
Curb & gutter bottom on
park side of park perimeter
streets, and one-half (1/2)
the cost of curb and gutter
bottom on Press Dr.
39,534.00
Contribution towards street
construction
232,000.00
Installation of catch basins
and leads on the park
side of the park perimeter
streets, and one-half the
cost of drainage on North
Press Drive
31,623.00
$360,657.00
I have recommended that in lieu of asphalt streets which were originally proposed, the developer will provide six (6inch) inches of non-reinforced concrete 2000# strength with one and one-half (1 1/2) inches asphalt wearing surface on the secondary streets and eight (8inch) inches of reinforced concrete 2000# strength with one and one-half (1 1/2) inches asphalt on the major streets and bus route in accordance with the specifications to be approved by the Director of Streets. I feel that by this substitution that *266 the maintenance costs of these streets in future years will be materially decreased. Accordingly, the City will, itself, contribute or obtain from the Civil Improvement Fund of the New Orleans Public Service, Inc., an additional sum of $163,000.00 for this street construction during the calendar years of 1955 and 1956 over and above the $360,657.00 previously stated. All other costs for street construction, which shall only include those streets within or abutting the subdivision, shall be borne by the developer. These estimates are for the entire project and it is recognized that costs for the several sections in which the project will be constructed will be less. Determination shall be made of the total measure of each item above described for the entire project and on or before the 15th day of each month the City shall pay to the developer that percentage of each item which has been completed in place during the preceding month. The developer will have such work performed by contract and the developer will furnish bond guaranteeing such performance of work in each section as section maps are filed and streets therein are dedicated. 3. The City shall provide, at its own *267 cost and expense, all streets traversing the park area as and when needed for the proper operation of bus routes in the area and communcal service in the area. In addition to the foregoing, the City will: (a) take immediate steps to fill in and clean out the area between Hayne Boulevard and the Southern Railroad; (b) look into the possibility of doing some temporary paving of the entrances from Burma Road to the park; (c) make clearance of the right-of-way for the large diameter drainage pipe cutting across the park in order to permit the developer to provide as quickly as possible the necessary drainage for the park and the housing development; (d) take up with New Orleans Public Service, Inc. the removal of a power line existing on old right-of-way across Morrison Road; (e) provide drainage easements across the park and cooperate with the developer in closing existing streets which are to be replaced in part by streets to be dedicated by the developer. 4. The outfall trunk drainage for the park and proposed subdivision will consist of a 72-inch pipe in Prentiss Avenue and two large oval pipes connected thereto and traversing the park and serving the park and the proposed *268 subdivision at Hibernia Avenue a 60-inch pipe serving the park and subdivision. The total cost will be estimated by the Sewerage and Water Board and that amount will be the denominator of a fraction, and $80,000 to be contributed by the Sewerage and Water Board for the whole project will be the numerator of that fraction and the Sewerage and Water Board will furnish the developer as the installation progresses the necessary material forming its share as shown by the fraction described as the outfall trunk drainage work in place at the end of the preceding month. All work shall be performed subject to inspection and approval by the Sewerage and Water Board. 5. With reference to water refunds, the Sewerage and Water Board would purchase the water pipe required, after due advertisement, payment for this water main purchase would be by Pontchartrain Park Homes, Inc. As the residences are connected to the main, the Sewerage and Water Board will refund, on this purchase of pipe $100.00 for each residence connected to the main. The Sewerage and Water Board acknowledges developer's intention to build this subdivision in four stages or sections. No refund on any section will be made after *269 two years from date of completion of the water mains in that section. 6. The developer will pay $28,700.00 for the purchase and installation of a cable from Pumping Station No. 17 to Pumping Station No. 23 after due advertisement and prior to award of the contract by the Sewerage and Water Board. It is understood that the developer will install the water mains complete with valves and hydrants and in accordance with the plans, specifications and inspection of the Sewerage and Water Board. 7. The Sewerage and Water Board will furnish the developer engineering plans, specifications, contract documents and inspection for the sewerage collection system, water distribution system and outfall trunk drainage, but not for subsurface drainage. The Sewerage and Water Board will furnish and install at its expense water service house connections and meters. The developer will provide at its expense the entire insite sewerage including house connections except that the house connections on the offsite approach main to Section 1 will be installed at the expense of the Sewerage and Water Board. All costs for these items except as herein otherwise stipulated shall be borne by the developer. *270 The Sewerage and Water Board will enter into no agreement for their part of this work until it has received from the developer an official letter agreeing to the conditions outlined in Sections 4 to 7 inclusive. This official letter shall be signed by the proper Officer of Pontchartrain Park Homes, Inc. with the approval of the Board of Directors thereof, and subject to the approval of the Special Counsel of the Sewerage and Water Board. The agreements of petitioner with the City of New Orleans and the Sewerage and Water Board were made the subject of formal contracts dated respectively February 8, 1955, and January 24, 1955. Petitioner began development of Section 1 in accordance with the plans and its contracts with the City and its Sewerage and Water Board on January 21, 1955. By June 26 of that year, 35 model homes had been constructed on developed lots. At this point a grand opening of the subdivision was held. The opening was widely advertised in newspapers and through television. Such advertising indicated petitioner's then intention to develop and subdivide the entire 211-acre tract into lots upon which residences might be constructed of a cost ranging between about $10,000 *271 to $27,000 and that financing for the purchasing of the lots and the construction thereon of residential buildings would be available through FHA or VA. On November 4, 1955, development of Section 2 was begun. In January 1956, petitioner sold 8.65 acres out of Section 2 to the Orleans Parish School Board for a public school site at a price of $14,177 per acre and, on August 2, 1956, sold 4.4439 acres out of Section 2 to the Archdiocese of New Orleans for a school and church site at the same price per acre. The profits on sales of these properties were treated by petitioner as ordinary income arising from its business and petitioner did not claim capital gain treatment with respect to these sales. On May 6, 1956, the City of New Orleans officially dedicated the one-half million dollar golf course in Pontchartrain Park. Its $30,000 golf clubhouse was under construction in June 1956 and was due for completion in September 1956. The baseball stadium was near completion in June 1956. As of June 1, 1956, petitioner had sold 300 homes and 66 more were under construction due for completion in June. As of January 31, 1957, petitioner had completed development of 556 homesites of which 188 remained *272 unsold. Petitioner's market for the sale of lots and homes in the subdivision was untested, uncertain, and problematical. This type of real estate project was unique in its experience and the experience of those in control of petitioner. It was advised by its engineer that the development of Sections 3 and 4 on the west and northwest of the horseshoe would present greater problems with respect to drainage and piling than was the case with Sections 1 and 2 and would therefore be more costly to develop. Abutting Section 4 on the west was a residential area which petitioner considered to be so rundown and unsightly as to hinder the marketability of any homes or lots developed in Section 4. As of January 31, 1957, because of these conditions, petitioner had at least temporarily ceased to carry out further development with respect to Sections 3 and 4 of the tract and, in fact, did no further developing in those sections for about a year thereafter. During this period petitioner was willing to sell all or a portion of Section 4 as undeveloped land to any purchaser who would meet petitioner's selling price therefor. As of that date, all undeveloped portions of the 211-acre tract were carried *273 on petitioner's books as inventory. On or about July 8, 1957, a sale in Section 4 of 17.141 acres of undeveloped land (hereinafter referred to as 17 acres), which was in its entirety undeveloped, was made to the State Board of Education of Louisiana for a cash consideration of $222,833 or at a price of $13,000 per acre. Petitioner allocated a cost of $4,000 per acre, or an amount of $68,564, to this sale and sustained expenses of sale of $249.05 in determining the gain of $154,019.95 realized on the sale of the 17 acres. On November 27, 1957, petitioner's agreement with the City of New Orleans was amended to take cognizance of the sale of the 17-acre parcel out of Section 4 and the City's total agreed contribution of $523,657 to the cost of development was reduced by $92,080.38 to $431,576.62. The agreement with the Sewerage and Water Board of New Orleans was also amended to extend the period of the contract and to eliminate from the contract the portion of the Pontchartrain Park property sold to the State Board of Education of Louisiana. At the time of the sale of the 17-acre parcel of land out of Section 4 to the State Board of Education of Louisiana petitioner was obligated *274 under its contracts with the City of New Orleans and the Sewerage and Water Board of New Orleans if it proceeded to develop Section 4 to install a 60-inch drainage pipe to service Section 4 on a cost sharing basis with the Sewerage and Water Board. Such a drain was installed by petitioner after the sale of the 17-acre parcel to the State Board of Education of Louisiana. The 60-inch pipe, together with a 72-inch drainage pipe to which it was connected at its southern end, provides drainage for the entire subdivision of Pontchartrain Park, including the 17-acre parcel, and the City's municipal park properties. The 72-inch and 60-inch pipe were necessary improvements for both the 183.59 acres of the City and the properties in the Pontchartrain Park subdivision since most of the properties are below sea level. The petitioner did not include any of the anticipated costs of installing the 60-inch drainage pipe in the costs of sale of the 17-acre tract in determining the profit realized upon this sale although the 60-inch drainaige pipe served to drain this property along with other properties of the subdivision and the City's park properties. Petitioner's income during 1956 and 1957 *275 was derived only from sales of lots, houses, and the parcels of land sold as a public school site, to the Archdiocese of New Orleans and to the State Board of Education of Louisiana. The gross receipts from these sources during such fiscal years were $2,284,217 for the fiscal year ended January 31, 1956, and $2,437,993 for the fiscal year ended January 31, 1957. During 1958, 1959, and 1960 petitioner developed Section 3. In 1960, W. H. Crawford desired to purchase the interests of the Sterns and Keller in petitioner so that he could make Pontchartrain Park Homes, Inc., a whollyowned subsidiary of Crawford Corporation. Accordingly, he offered to buy the stock from these parties on the same basis they would have realized had the balance of Section 3 been developed. As a part of the transaction in 1960, the remaining portion of Section 4, consisting of 8.33 acres, was transferred to K. & S. Corporation, a Louisiana corporation organized by the Keller and Stern interests. By February 28, 1961, petitioner had determined to proceed with the development of the remaining 8.33 acres (hereinafter referred to as 8 acres) of Section 4. This determination resulted partly because the unsightly *276 residential area to the west of Section 4 had become available for purchase by petitioner and because the spreading of the cost of development of the 8 acres over the more easily developed additional acreage made the resulting homesites more readily salable. Development of the 8 acres was begun on May 2, 1961. In its income tax return for the year at issue petitioner reported the gain from the sale of the 17 acres of Section 4 as capital gain. In his deficiency notice respondent has treated such gain as ordinary income. Ultimate Finding On the date of their sale the 17 acres of Section 4 were not held by petitioner primarily for sale to customers in the ordinary course of its business. Opinion There is no controversy concerning the holding period of the 17 acres of land, the sale of which gives rise to the issue to be decided. No issue relates to the amount of the gain derived therefrom. The sole issue is whether at the date of the sale the 17 acres were held by petitioner primarily for sale to customers in the ordinary course of its business. The issue is one of fact which we have disposed of in our ultimate finding. It has been held generally that unimproved or undeveloped *277 land in the hands of a taxpayer whose business is that of the improvement and development of raw land and thereafter its sale is a capital asset and that its sale in that condition results in capital gain. Nelson A. Farry, 13 T.C. 8; Charles E. Mieg, 32 T.C. 1314; Eline Realty Co., 35 T.C. 1. There are however exceptions where such sales have been held to result in the gain being treated as ordinary income. Donald J. Lawrie, 36 T.C. 1117; August Engasser, 28 T.C. 1173. From an examination of these and like cases we are again impressed with the fact that no criteria exist by the use of which this issue can be universally determined. Decision herein must turn upon the facts of this case alone. Petitioner was incorporated for the purpose of engaging in the business of developing raw land for sale in lot form to a market, the potentialities of which were a virtually unknown and untested factor in its experience or that of its incorporators. The existence and scope of the Negro market in New Orleans for the purchase of homes in the $9,000 to $27,000 price range was so problemetical as to lead to the unique situation where *278 the City underwrote a substantial portion of the cost of development of Pontchartrain Park subdivision. In fact it was at the instigation of the City that petitioner's incorporators were prevailed upon to carry out the project. Even then, however, petitioner was not bound by any contract relationship to develop all or any portion of the 211-acre tract it acquired for that purpose. The obligations of both the City and petitioner were contingent upon petitioner's actual development of the land. Against this background we do not think petitioner's intent with respect to the purpose of its holding of the 17-acre tract at the time of its sale may be viewed in the same light as that of a dealer in real estate market and its influential factors are tested and known. At the outset of the project petitioner had no basis for determining the number of developed lots the existing market would absorb and for that reason developed the total tract in four sections. It is clear to us that by the time Sections 1 and 2 had been developed sales of lots had begun to be affected by buyer resistance brought about by the cost of acquisition of the homesites plus the cost of construction of homes to be *279 built thereon. It seems only natural if not necessary from the standpoint of good business procedure that petitioner, with 188 lots still unsold in Section 2, would, as it did, approach further development with caution. It was for that reason that Section 3 was itself developed in subsections. As respondent contends, however, we are convinced that petitioner, at the date of sale of the 17-acre tract, had not abandoned its purpose of ultimately developing Section 4 and selling the lots thus made available for sale. It seems to us, however, that because petitioner retained its original purpose with respect to Section 4, this fact requires a holding that the 17 acres, when sold, were not held by petitioner for sale to customers in the ordinary course of its business. In the first place, the ordinary course of its business is clearly shown to have been the development and sale of land which was improved to the point where it had been subdivided into lots which were prepared for the erection of houses or to the point where dwellings had actually been erected thereon. It cannot be seriously contended that any portion of Section 4 had been so improved at the date of the involved sale. Secondly, *280 we find it incongruous to conclude that the only sale of undeveloped land which is shown to have occurred took place with a customer as that word is used in section 1221(1) of the Internal Revenue Code of 1954. The ordinary course of petitioner's business was the sale of developed land to customers who were seeking a home and who were the antithesis of a purchaser who would be interested in land unprepared for the erection of a home. When petitioner acquired the original 211 acres of raw land, we think it was held by it as an investment and remained an investment until it was developed to the point where it could be sold to its customers when it properly became property of a type necessary to be included in inventory, the sale of which at a gain would produce ordinary income. The 17-acre portion of Section 4 was still held as an investment when sold, for nothing had occurred to change its character. The fact that petitioner actually carried the unimproved portions of the 211 acres on its books in an inventory account is not at all conclusive of the true character of such property. While it is true that the potential earnings to be derived from the development *281 and sale of Section 4 in lots bear upon the purpose for which the 17-acre tract was held at the time of its sale, petitioner's intent in that respect was we think shaped by the existing condition of the market and the advice it had received from its engineer relative to the potential increased cost of development of that section. We are convinced that under those conditions petitioner had in fact decided to forego further development and to liquidate its remaining unimproved acreage. That it thereafter decided to and did complete the development and sale of the remaining acreage, does not require a holding that such was its purpose on the date of sale of the 17 acres. It seems clear that the resumption of its original purpose was brought about by the becoming available to petitioner of the unsightly residential area to the northwest of Pontchartrain Park after its sale of the 17-acre tract, the acquisition of which would enable petitioner to lower its cost of developing Section 4 and at the same time increase the potiential sales value and the market for Section 4 homesites. The sale of the 17 acres was not in the ordinary course of petitioner's business. Respondent's primary contention, *282 as we understand it, seems to be that, assuming petitioner's ordinary course of business was the development and sale of only improved lots, its contractual obligation with the City to install a 60-inch drain to service all of Section 4, together with other improvements, requires that we view the sale of the 17 acres as though such obligations had been complied with at the time of the sale. Inasmuch as the touchstone of decision here is the petitioner's purpose in holding the property on that date and inasmuch as petitioner's obligations under its contract were conditional upon its development of the land sold, we are not impressed with this position. Even though petitioner had been obligated unconditionally to make such improvements, that fact would not be conclusive with respect to its purpose for holding the property at the time of its sale nor would we be justified in treating the 17 acres as having been improved in face of the fact that such was not and might never be the case. Consideration of the entire record leads us to conclude that the gain from the 17-acre sale is properly to be treated as capital gain. Decision will be entered for the petitioner.