Thomas M. Peters and Marian P. Peters v. Commissioner. Isabel Peters v. Commissioner.
Peters v. Commissioner
Docket Nos. 87775, 87776.
United States Tax Court
T.C. Memo 1963-171; 1963 Tax Ct. Memo LEXIS 172; 22 T.C.M. (CCH) 813; T.C.M. (RIA) 63171; June 20, 1963
*172 Held, a loss sustained by tenants-in-common on the sale of unimproved real estate which they had received upon the liquidation of a family corporation was a capital loss. Fred R. Tansill, 824 Connecticut Ave., N. W., Washington, D.C., for the petitioners. Eugene L. Wilpon, for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: Respondent determined deficiences in income tax for the year 1955 against Thomas M. and *173 Marian P. Peters in the amount of $6,130.78, and against Isabel Peters in the amount of $6,540.89. The sole issue presented is whether the loss of $28,962.39 sustained by petitioners in 1955 upon the sale of 29.216 acres of unimproved real estate owned by them as tenants-in-common constituted an ordinary or a long-term capital loss. Findings of Fact Some of the facts have been stipulated and the stipulation together with the exhibits attached thereto are hereby adopted. Thomas M. and Marian P. Peters are husband and wife residing in Bernardsville, New Jersey. They filed a joint income tax return for the year 1955 with the district director of internal revenue for the Upper Manhattan District of New York. Marian is a party to these proceedings solely by reason of having filed a joint return. Isabel Peters is a single person residing in New York City. She filed an individual income tax return for 1955 with the district director of internal revenue for the Lower Manhattan District of New York. Thomas and Isabel, sometimes hereinafter referred to as petitioners, are brother and sister. Isabel was born October 13, 1881, and Thomas was born June 28, 1888. In 1903 petitioners' father *174 purchased 80 acres of land at Oyster Bay on the north shore of Long Island, New York, and constructed a large 21-room family residence thereon in 1904. In addition to the main house, a gardener's cottage, stable, and water tank house were also constructed, modern conveniences and facilities were provided and much of the area was landscaped. Two cottages and adjoining acreage near the shore were later purchased, increasing the Oyster Bay property to 83.504 acres. The residence was thereafter occupied by the father, Isabel and another daughter, Alice, as the Peters family home. They also had a town house at 6 East 69th Street in New York City. Prior to 1931 the father formed Hawirt, Inc., a family corporation, to which the Oyster Bay property was transferred as its sole asset. The stock in Hawirt, Inc., was given to the three children: 833 shares each to Isabel and Alice and 834 shares to Thomas. The father died March 17, 1931, and Alice died in November 1931. Upon Alice's death her shares of stock in Hawirt, Inc., were divided equally between Thomas and Isabel. Hawirt, Inc., was dissolved in 1935, and Thomas and Isabel each received a one-half interest in the Oyster Bay property *175 as tenants-in-common. Prior to 1931, petitioners discussed selling the Oyster Bay property but decided not to do so while their father lived. After he died, in April 1931, Thomas obtained from a real estate broker the prices at which neighboring properties were listed for sale, in order to determine a reasonable selling price for their Oyster Bay property. Isabel continued to occupy the family residence at Oyster Bay by herself for about two years after the death of her father and Alice. It was then rented for about one year and thereafter, from 1934 until the last parcel was sold in 1955, was continually offered for sale. Schedules of rentals received by each of the petitioners indicate other portions of the Oyster Bay property may have been rented during the period 1933 to 1946, but only the rentals received from the "Kirkwood" cottage during 1942 to 1946, inclusive, are clearly identified. It does not appear that the 29.216 acres involved was ever rented. In 1935, the Oyster Bay property was listed for sale as a whole with a number of real estate brokers. Being unable to sell it as a whole, petitioners then had the property divided by a landscape architect into 3-acre lots, *176 the minimum size permitted under local zoning ordinances, but none of the 3-acre lots were sold. There is no evidence a plat of such lots was ever filed. The property was thereafter sold in parcels of various sizes and resulted in net gain or loss as follows: Date Sold
Purchaser
Purchase Price
Property Sold
Net Gain orloss
(1) 5/ 2/39
John Marsh
$67,000
15.735 acres
($64,244.63)
including
main residence
(2) 2/27/41
John Marsh
3,750
4.070 acres
($10,948.11)
including
supt.'s cottage
(3) 6/ 9/44
Merton
3,500
5.940 acres
($ 2,704.41)
unimproved
(4) 6/21/45
Merton
6,025
6.693 acres
($ 1,359.31)
unimproved
(5) 3/26/46
Carlysle
25,000
2.105 acres
$ 988.10
including
(6) 8/29/47
Davis,
Kirkwood
Doubleday &
cottage
Groff
17,710
16.745 acres
$ 107.33
unimproved
(7) 11/28/50
Greeff
4,000
3.000 acres
($ 3,406.07)
unimproved
(8) 8/23/55
John Frazer,
Frank Fa-
gin and Thomas
E.
O'Callahan
36,000
27.536 acres
unimproved *
(9) 8/23/55
Greeff
2,000
1.680 acres
unimproved *
($29,460.95) **
*177 Of the seven sales preceding 1955, ordinary losses had been allowed by the Internal Revenue Service on items 1, 2, 4, and 7. A loss was also sustained on item 3, but had not been claimed. Gains realized on items 5 and 6 were reported as ordinary income. Depreciation had also been taken on the buildings included in items 1, 2, and 5. Items 8 and 9, being the properties involved herein, were sold in 1955 for an aggregate of $38,000. Expenses in connection therewith aggregated $2,638.17 and the net proceeds of the sales to petitioners were $35,361.83. Cost or basis of these two properties to petitioners was $64,324.22. The resulting loss to petitioners on the sales was therefore $28,962.39. Thomas and Isabel each reported one-half of this amount, namely $14,481.20, as an ordinary loss on their respective income tax returns for the year 1955. The two properties sold in 1955 were unimproved and consisted of 17.4852 acres of orchard and pasture and 11.7716 acres of woodland. They were irregular in shape, and the topography was uneven with some steep slopes. A small portion fronted on "Horseshoe Road" on the west side. Other access was by means of a "private" road, formerly maintained *178 by the Peters family, which traversed the "Oyster Bay property" in a northwesterly direction and apparently furnished access for the main residence to the West Shore Road on the east. This road had also been used by the public for many years as a "cut-off" from the West Shore Road to Horseshoe Road. The properties involved, considered separately or as a whole, were not feasibly susceptible to subdivision into 3-acre lots. No "For Sale" signs were ever placed on the property here involved or on any of the parcels previously sold. The only time it was advertised for sale was in 1931 when a real estate brokerage firm published a brochure offering the entire Osyter Bay property and improvements for sale as a whole or subdivided into improved and unimproved portions. The principal income of each of the petitioners during the taxable year 1955, as well as for many years prior thereto, was derived from stock dividends, interest on real estate mortgages, notes and bank deposits, rents from tenements and other properties, and gains from the sales of securities, mortgages, and real estate. Some of the mortgages and real properties, exclusive of the Oyster Bay property, were jointly owned *179 by Thomas and Isabel and had apparently been inherited from their father and sister; others were individually owned. So far as the record indicates, all such real properties, exclusive of the Oyster Bay property, as were sold prior to the taxable year involved were properties which had been held by petitioners, jointly or severally, for income-producing purposes or for appreciation of capital investments. None of such properties were properties which had been held by petitioners for sale to customers in the ordinary course of a trade or business. Thomas and his wife reported net taxable income for 1955 in the total amount of $158,746.79. Isabel reported net taxable income for 1955 in the amount of $145,516.95. The return filed by Thomas and his wife reflects that his occupation was "Investments." The return filed by Isabel does not reflect any occupation. Neither Thomas nor Isabel has at any time been a registered real estate broker, and neither of them has been engaged in the business of buying and selling real property. The 29.216 acres involved herein was not property held by petitioners primarily for sale to customers in the ordinary course of their trade or business; nor was *180 it property used in the trade or business of the petitioners. The loss incurred by petitioners on the sale of the 29.216 acres involved herein in 1955 was a capital loss. Thomas and Isabel each sustained a capital loss in the amount of $14,481.20 on the sale of the 29.216 acres involved in 1955. Opinion The sole issue is whether a loss in the amount of $28,962.39 concededly sustained by petitioners in 1955 upon the sale of 29.216 acres of unimproved real estate owned by them as tenants-in-common was an ordinary or a long-term capital loss. Petitioners contend that the property in question was held by them primarily for sale in the ordinary course of their trade or business, or that it was property used in their trade or business, within the meaning of sections 1221 and 1231 of the Internal Revenue Code of 1954. [1] Respondent denies that the property in question was held by petitioners primarily for sale to customers in the ordinary course of their trade or business or that it was used in a trade or business, within the meaning of either section. He contends that the sale in question was merely the liquidation of the remaining portions of a large residential *181 estate acquired by petitioners through gifts from their father. We agree with respondent. *182 The property involved was originally part of a large residential estate, consisting of 83.504 acres on which was located a large 21-room house and certain other buildings and appurtenances. Petitioners' father purchased 80 acres in 1903 and constructed the house thereon in 1904. He later acquired two cottages and adjoining acreage, thereby increasing the total acreage to 83.504 acres. The main house was occupied as a family home by the father and his two daughters, Isabel and Alice, until the father's death in 1931. Prior to 1931, the father organized Hawirt, Inc., a family corporation, and transferred the Oyster Bay property to it as its sole asset. He then gave the entire stock in Hawirt, Inc., to his three children. Alice died in November 1931, and her stock was distributed between Thomas and Isabel. Hawirt, Inc., was dissolved in 1935 and thereafter Thomas and Isabel each owned an undivided one-half interest in the Oyster Bay property as tenants-in-common. Isabel lived in the main residence by herself for about two years after her father and Alice died. It was then rented for about one year. From 1934 until the last parcel was sold in 1955 the entire property was listed with *183 various real estate brokers and continuously offered for sale. No "For Sale" signs were ever placed on any of the property and the only time it was advertised for sale was in 1931 when one real estate brokerage firm published a brochure offering it for sale as a whole or subdivided into improved and unimproved portions. Being unable to sell it as a whole, petitioners had it plotted into 3-acre lots, but there is no evidence a plat thereof was ever recorded, and none of the 3-acre lots were sold. Thereafter, the property was sold in nine parcels of various sizes. All improvements, including the main residence, a superintendent's cottage and the "Kirkwood" cottage were sold in 1939, 1941, and 1946, respectively. No improvements were ever located on any of the other parcels, including the 29.216 acres involved herein, and none of the unimproved parcels were ever rented. The problem of whether real estate is held primarily for sale to customers in the ordinary course of a trade or business has been considered by this and other courts on numerous occasions. Criteria have been mentioned in the various opinions which may have weight in resolving the issues in a particular case. Among these *184 have been the purpose, reason for, and manner of the acquisition of the property; the number, frequency, and volume of sales; the extent to which the owner or his agents have engaged in sales activities, by developing, improving, and advertising the property; and whether the taxpayer continued to purchase more properties during the period as part of a basic plan of buying and selling real estate. Standards which may be of aid in some settings, however, are of little aid in others. No single factor is necessarily controlling, and each case turns upon its own facts. W. T. Thrift, Sr., 15 T.C. 366; Boomhower v. United States, 74 F. Supp. 997. It is recognized that a taxpayer may be a dealer as to some real estate holdings and a passive investor as to others. Eline Realty Co., 35 T.C. 1, and cases cited. It is also settled that the purpose for which property is held is subject to change and that the determining factor is the purpose for which the property in question is held at the time of sale. Eline Realty Co., supra, and cases cited. See also Heiner v. Tindle, 276 U.S. 582; Warren Leslie, Sr., 6 T.C. 488. *185 We think it abundantly clear from the evidence presented herein that the property in question was not held by petitioners primarily for sale to customers in the ordinary course of their trade or business. Neither Thomas nor Isabel was a real estate broker and neither was engaged in the business of buying and selling real estate. The principal income of each of them was derived from investments and consisted of stock dividends, interest on real estate mortgages, notes and bank deposits, rents from rental properties, and gains from the sale of securities, mortgages and real properties. Such real properties, other than the Oyster Bay property, as were sold prior to the taxable year, were apparently properties which had been held by petitioners, jointly or severally, for income-producing purposes or for appreciation of capital investments. The Oyster Bay property was clearly a capital asset when acquired by petitioners. For many years it had been the residential estate of their father. Such improvements as were made thereon were made in connection with such residential purpose. Petitioners made no improvements on the property after they acquired it, except such as were necessary to *186 enable them to rent the main residence for one year in 1934 and to rent the Kirkwood cottage prior to its sale in 1946. No improvements of any kind were made on any of the other parcels and none of the unimproved parcels were ever rented. Petitioners' selling activities in connection with the Oyster Bay property over a period of more than 20 years can hardly be considered as extensive. Aside from listing the property with real estate brokers and futilely dividing it at one time into 3-acre lots, little selling activity was performed. No "For Sale" signs were placed on any portion of it and the only advertisement was by a real estate brokerage firm with which it had been listed, in 1931, more than eight years before the residence was sold and 24 years before the sale of the parcels involved herein. Since petitioners were not in the business of buying and selling real estate, it is likewise clear that the property here involved was not used by them in such a business, within the meaning of section 1221 or section 1231. Nor was the property in question used by petitioners in the real estate rental business, the only other "business" in which, on the evidence presented, it might be *187 considered petitioners were engaged. The short answer to this is that the property in question was not rented by them at any time. Nor was the incidental rental of the main residence for one year in 1934, or the rental of the Kirkwood cottage prior to its sale in 1946, sufficient to convert the property in question into a rental usage. Cf. Estate of Maria Assmann, 16 T.C. 632. In our opinion the sale of the property in question was no more than the final liquidation of what had formerly been the residential estate of petitioners' family. Petitioners considered selling the entire Oyster Bay property even prior to the death of their father. After his death it was considered a "white elephant." Neither petitioner used it for residential purposes of their own after 1933. It was expensive to maintain and taxes had to be paid on it. Such rentals as were obtained on the improved portions were obviously insufficient to justify its retention. Petitioners took steps to dispose of it in the best manner they considered possible. Being unable to sell it as a whole for a satisfactory price they undertook to sell it off in 3-acre lots. Failing in this, they sold it in whatever size *188 parcels they could find purchasers for. Our conclusion that the primary purpose of petitioners was to liquidate the property is also sustained by the fact that with two minor exceptions (items 5 and 6) all parcels were sold at substantial losses. We might add that the tax treatment accorded the sales which were made on or prior to 1950, by internal revenue agents, is not controlling on the Commissioner or this Court with respect to the sale of the two parcels in question in 1955. Moreover, the facts and circumstances of such sales are not shown. We hold that the loss incurred by petitioners on the sale of the 29.216 acres involved herein in 1955 was a capital loss and that Thomas and Isabel each sustained a capital loss in the amount of $14,481.20 on the sale of such property in 1955. Decisions will be entered for the respondent. Footnotes
*. Paragraph 7 of the Stipulation of Facts shows these two tracts as 17.4852 acres of orchard and pasture, and 11.7716 acres of woodland, a total of 29.2568 acres. ↩
**. Paragraph 8 of the Stipulation of Facts shows the net loss of these two tracts as $28,962.39.↩
1. SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; (2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business; * * *
SEC. 1231. PROPERTY USED IN THE TRADE OR BUSINESS AND INVOLUNTARY CONVERSIONS. (a) General Rule. - If, during the taxable year, the recognized gains on sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. * * * (b) Definition of Property Used in the Trade or Business. - For purposes of this section - (1) General Rule. - The term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 167, held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not - * * *
(B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or * * *↩