Norman A. Grant and Genevieve K. Grant, et al. * v. Commissioner. Grant v. Commissioner
Docket Nos. 87269-87273.
United States Tax Court
T.C. Memo 1963-161; 1963 Tax Ct. Memo LEXIS 181; 22 T.C.M. (CCH) 771; T.C.M. (RIA) 63161; June 11, 1963
John P. Lipscomb and George W. Beatty, for the petitioners. Joseph N. Ingolia, for the respondent. KERN Memorandum Findings of Fact and Opinion These cases have been consolidated for hearing and opinion. They involve deficiencies determined by respondent in petitioners' Federal income taxes in the years and in the amounts as follows: Docket
No.
Petitioners
Year
Deficiency
87269
Norman A. Grant
1953
$ 64.70
and Genevieve K.
1954
946.54
Grant
1956
19,984.95
1957
1,459.09
87270
Wallace F. Holla-
1956
20,466.67
day and Wilhel-
1957
1,869.82
mina Cole Hol-
laday
87271
Henry J. Kauf-
1953
127.73
man and Irma
1954
749.04
N. Kaufman
1956
12,638.96
87272
Frank J. Luchs
1953
218.08
and Elizabeth
1954
547.77
K. Luchs
1956
9,459.55
1957
1,375.94
87273
Maurice D. Rosen-
1953
47.12
berg, Jr., and
1954
292.50
Charlotte R. Ro-
1956
7,930.08
senberg
1957
585.43
*182 All of the deficiencies arise by reason of respondent's determination that certain amounts realized by petitioners "from sales of land or land options" during the taxable years constitute ordinary income or, in the alternative, with regard to some or all of the property sold during such taxable year, "short-term capital gains from sales of property held for not more than six months." In view of a concession made by petitioners' counsel in his opening statement and restated on brief, "there is no longer any dispute about petitioners' tax liability with respect to the eight sales of property made by petitioners to controlled corporations during the years 1953 and 1954," which amounts are conceded to be short-term capital gains. The issues remaining for our decision are, as stated in petitioners' brief, "the proper tax treatment of the gains realized by petitioners in 1956 and 1957 from four different sales of property," i.e., (1) their interest in parcel 9 of the Eckert tract, (2) in parcel 2 of the Lesko tract, (3) in the "spear-shaped parcel" and their remaining interest in parcels 5 and 7 of the Rayen tract, and (4) in a small piece of land sold to the Standard Oil Company. *183 Findings of Fact Some of the facts in these cases have been stipulated. The stipulation and the exhibits attached thereto are incorporated herein and made a part of our findings by this reference. The petitioners herein filed joint Federal income tax returns for the years in question with the district director of internal revenue at Baltimore, Maryland, with the exception of petitioners Wallace F. Holladay, sometimes hereinafter referred to as Holladay, and his wife, who filed their joint returns for the years in issue with the district director of internal revenue at Richmond, Virginia. The wives are involved as petitioners in these proceedings solely because they filed joint returns with their husbands. Petitioner Norman A. Grant, sometimes hereinafter referred to as Grant, met Holladay while both men were working for a Washington, D.C., construction company. Grant is an architect and city planner and Holladay is an architect and architectural engineer. They desired to form their own construction company, and they discussed their plans with petitioner Maurice D. Rosenberg, Jr., sometimes hereinafter referred to as Rosenberg, and he in turn discussed the matter of providing *184 capital for the venture with Frank J. Luchs, sometimes hereinafter referred to as Luchs. Rosenberg is the president and substantial stockholder in a Washington insurance agency and Luchs owned 50 percent of the stock and was executive vice president of a Washington real estate brokerage firm which specialized in sales, property management, mortgage financing, appraisals, and insurance primarily on a commission or fee basis. Luchs' company did not trade or deal in real estate, although Luchs himself has an interest, as an individual, in certain rental property in the Washington, D.C., area. Thereafter, Luchs talked to his brother-in-law, petitioner Henry J. Kaufman, sometimes hereinafter referred to as Kaufman, a Washington advertising and public relations man, and Rosenberg discussed the matter with this father-in-law, Samuel M. Revness, [1] sometimes hereinafter referred to as Revness, who was president of the Ballard Co., a New York interior decorating concern. On September 30, 1952, Holladay and Grant, as the "first parties," and Luchs, Kaufman, Rosenberg, and Revness, [2] as the "second parties," entered into a written agreement *185 providing, among other things, for the formation of a company to be called the Grant-Holladay Construction Corporation. The Corporation was to "engage primarily in the construction and development of housing projects and other business that the parties may agree upon from time to time, whether or not apparently related thereto." This agreement, sometimes hereinafter referred to as the September agreement, further provided that "[the] first parties will locate a suitable site for the development of a project and will obtain in their own names an option for the purchase of land in connection with said development," permitting "the purchase of portions of said land over a period of time as and when need is had for said acreage in connection with the development." Grant and Holladay also agreed "to devote their full time and effort to the development of said business" in exchange for a minimum compensation of $1,000 per month and to "continue in the service of the corporation and complete any project which they may commence in its behalf.78 The second parties agreed to provide a total of $50,000 in cash to finance the operation of the company. It was agreed that Grant, Holladay, Luchs *186 and Rosenberg would each subscribe and pay for $250 of the stock of the corporation (only $1,000 of which was to be issued at the beginning of the corporation's business) with Luchs and Rosenberg advancing to Grant and Hollady $500 for this purchase and receiving as security the stock to be issued the latter two. It was also agreed that Luchs and Rosenberg would lend to the corporation $49,000. The parties to this agreement will be sometimes hereinafter referred to as "the group." It was the general intention of the group to acquire large tracts of land at various advantageous places in the United States, to develop such land to the extent feasible by the construction thereon of "housing projects" and to sell such property at a profit. It was the primary purpose of the group to make a profit from the purchase and later sale of interests in real estate, with the understanding that such profit would be ordinarily greater if the real estate was improved at the time of sale by reason of their own development and construction activity. At an early *187 stage in the enterprise it was agreed that the appropriate means by which their objectives might be accomplished would be for the individual members of the group to acquire options to purchase the tracts of land with the right to exercise such options piece-meal with regard to various parcels included within such tracts, for the options covering such parcels to be sold or assigned to various corporations later to be formed which would be owned by the group and which would later sell improved lots thereon to the public, and for the Grant-Holladay Construction Corporation to do all of the development and construction work. As provided in the September agreement, the Grant-Holladay Construction Corporation, sometimes hereinafter referred to as Construction Company, was organized as a Delaware corporation on December 23, 1952, and since that time it has engaged in the construction of at least 6 different housing projects. At all times material herein Grant and Holladay devoted their full time to their jobs as officers and employees of Construction Company, each owning 25 percent of its outstanding stock, while Kaufman, Luchs, Rosenberg, and Revness each owned 12 1/2 percent. They also *188 shared the profits and losses resulting from the transactions of the group in the same proportions. The group acquired options to purchase various building sites for the purpose, inter alia, of determining before the land was purchased whether the land could be zoned for residential use and whether the necessary sewer and water facilities could be obtained. Another important reason for the use of options was to make it possible for the group to control a relatively large tract of land with a small amount of capital. By providing in the option for the purchase of parcels within the tract at various intervals, the funds received from the development of the first parcel could be used to finance the purchase of the next. Because portions of a particular tract were not adaptable to residential construction, and because it was not known which of several subsidiary corporations subsequently formed by the group was to develop a particular parcel, the members of the group obtained options in their own names on the understanding that the options and "any income, gain or advantage derived therefrom would be held in trust" for all members of the group in proportion to their relative interests. *189 The first site upon which the group acquired an option was a farm near Dayton, Ohio. Both Grant and Holladay were familiar with the Dayton area, having worked there for their previous employer. Sometime prior to November 1952 they inspected the farm, which was owned by four elderly people referred to herein as Eckert, et al., and they agreed that it was the best site available for their purposes, by reason of its size, its location and the fact that they could get a long term option thereon. For convenience in developing the farm they divided it into 10 more or less equal parcels. On or about November 21, 1952, Luchs, acting for the group, entered into an "Option Agreement" with Eckert, et al., which provided in material part as follows: NOW, THEREFORE, in consideration of the sum of FOUR THOUSAND DOLLARS ($4,000.00) in hand paid by the Purchaser to the Sellers, receipt of which hereby is acknowledged, the Sellers do hereby grant unto the Purchaser an option or options to purchase said land at the time or times, and for the considerations, and upon the terms and conditions hereinafter set forth, to-wit: 1. Subject to the conditions hereinafter set forth, the Purchaser shall have *190 the right at any time within four (4) months from the date of this Agreement [3] to purchase Parcel 1 of the above described tract, as shown on the plat attached hereto, by giving to the Sellers at least five (5) days prior written notice, and in the event Purchaser shall exercise said option, he shall pay to the Sellers as purchase price of said property an amount equal to One Thousand Five Hundred Fifty Dollars ($1,550.00) per acre for all of the land contained in said Parcel 1, payment of which shall be made as follows: Cash on delivery of deed (which shall be effected within thirty (30) days after the date of exercise of said option). (a) If the Purchaser shall exercise his option to purchase Parcel 1 as aforesaid, the property is to be conveyed to the Purchaser by good and valid deed with full warranty of title, free of encumbrances, except sewer easement along the southerly portion of the tract and other easements in favor of the Dayton Power & Light Company for the installation and maintenance of their power lines. Title is to be good of record and in fact and fully marketable, otherwise the deposit *191 is to be refunded in full and contract declared null and void unless the defects are of such character that they may readily be remedied by legal action. In case legal steps are necessary to perfect the title, such action must be taken by Sellers promptly at their own expense, whereupon the time specified herein for full settlement by Purchaser will be extended for the period necessary for such prompt action; but if, with such legal action the title cannot be remedied within six (6) months from date hereof, Purchaser shall have the right to cancel this contract and obtain full refund of his deposit. If title is found defective and not remedied as aforesaid, the cost of title examination shall be paid by Sellers. (b) Taxes and assessments are to be adjusted to the date of settlement according to the records of the appropriate tax official of the County and State aforesaid, except that assessments or charges for street, highway, sewer, water and other utilities installed and abutting said property by or for the Purchaser shall be paid for by the Purchaser. (c) Cost of preparation of the deed of conveyance shall be borne by the Sellers. Federal and state documentary stamps on the *192 deed of conveyance shall be paid by the Sellers. (d) Possession shall be delivered to the Purchaser at the time of settlement, free of tenants or occupants. 2. The Purchaser shall have the right to purchase Parcel 2 of the land aforesaid, as shown on the plat attached, at any time within one (1) year following the date of settlement of Parcel 1 aforesaid, at the price of One Thousand Five Hundred Fifty Dollars ($1,550.00) per acre, payment of which shall be made in cash as provided for Parcel 1 aforesaid. (a) All of the terms and conditions set forth above as to Parcel 1 of the above described land shall be fully applicable to Parcel 2 of said land. [4]
* * *
Before the Eckert option was exercised as to the first parcel Grant and Holladay made a rough development plan for the entire tract, including the street pattern and the location of houses. No houses were planned on the southern portion of the tract, composed of two low-lying parcels numbered 9 and 10, because in their opinion it would be uneconomical to develop the land into residential *193 property due to the rough topography caused by the presence of a large stream running through both parcels. This plan had a notation thereon referring to these parcels as "proposed shopping center." The presence of a shopping center close to a residential development facilitates the sale of houses in the residential development. During the times here in question there was competitive and aggressive interest on the part of many people in the construction of shopping centers near housing developments in which a number of houses had been constructed and sold, and anyone owning real estate suitable for such purpose had no difficulty in selling it without advertising it for sale. Petitioners were not unaware of this. About 50 percent of the housing projects of a size similar to those contemplated by the group have areas set aside for shopping centers. The members of the group had no intertion themselves of building any shopping centers or operating them as investments and never have built any such centers. Sometime in January 1953 a Dayton firm of consulting engineers was hired to prepare a preliminary development plan for the Eckert tract using the rough plan made by Grant and *194 Holladay as a guide. The engineers agreed that the southern portion of the Eckert tract (parcels 9 and 10) was "not suitable for residential development," and in their preliminary plan, which was completed in March 1953, the words "proposed shopping center" appeared in the southern corner of the Eckert tract, following the use of the area indicated by Grant in his plan. Later, 10 or 11 houses platted on the March 1953 plan were eliminated as not being economically feasible because of the downward slope of the land as it approached the creek. On a second plan prepared in June 1954 the area previously assigned to these houses was added to the proposed shopping center site, which then comprised all of parcel 9 or an area of 14,915 acres. On March 31, 1953, the zoning authorities approved an application previously filed by Grant for the rezoning of the entire Eckert tract from agricultural to residential use, permitting lots with a minimum frontage of 60 feet and a minimum area of 7,200 square feet. Grant had been advised to have the entire tract rezoned residential before applying for business zoning for the shopping center site. On May 11, 1954, as a result of Grant's application, *195 an ordinance was passed by the village of Kettering, Ohio, rezoning 15.56 acres of the Eckert tract, including all of parcel 9, to a classification permitting the construction of a neighborhood shopping center. Pursuant to its earlier decisions, the group caused separate corporations to be formed to purchase the parcels suitable for residential development as well as to own and sell the houses to be built by Construction Company acting as general contractor. One reason for this decision was that the banks dealing with the group limited the amount loaned to any one borrower. Beginning on May 12, 1953, and ending on September 14, 1954, the group, in separate transactions, sold its interest in parcels 1 through 8 to eight separate corporations, all of which were controlled by the group in the same proportion as Construction Company. The corporation acquiring parcel 1 of the Eckert tract was known as Newcom Knolls Corporation, the corporation acquiring parcel 2 was known as Newcom Knolls Section Two, Inc., and each of the remaining first eight parcels was transferred to similarly named corporations, the section number corresponding to the number of the parcel transferred to the corporation *196 for development. In each case the sales price of the parcel was $3,000 and the total gain realized by all members of the group was $2,600. Each petitioner reported his proportionate share of the total gain realized from the sale of parcel 1 as a short-term capital gain, while the amounts realized from the sale of parcels 2 through 8 were reported as long-term capital gains. Petitioners have now conceded that the gains realized on these sales were taxable as short-term capital gains and that deficiencies exist for the years 1953 and 1954 in the exact amounts determined by respondent for those years. The eight controlled corporations paid Eckert, et al., the purchase price of and received a deed to the parcel each acquired. By late 1954 or early 1955 the eight parcels were fully developed with houses in the $10,000 $12,000 price range. These houses were built by Construction Company and sold to the public by the corporations owning the land upon which they were built. A local real estate agent was hired to assist in the selling. No houses were built on any part of parcels 9 and 10, and sometime in 1955 the group released its option rights to a part of parcel 10 to a church organization. *197 No consideration was given for the release, and the church organization purchased the land from Eckert, et al., at the prices specified in the Eckert option. In its raw state parcel 9 was not suitable for either houses or a shopping center. The cost of making it suitable for residential development would have been prohibitive, but the cost of adapting it for a shopping center would be so much less that the use of this area for that purpose was economically feasible. Although the group or its members did not have any plans for themselves constructing a shopping center on it, it was their expectation that a shopping center would eventually be built there, after other parcels had been developed and the houses constructed thereon had been sold. It was not listed for sale and it had not been advertised. On August 10, 1956, Luchs, acting for the group, entered into an agreement with a Dayton realtor named Fahrendorf who wanted to build a shopping center on Parcel 9. The group gave the realtor a 5-month option to purchase its option rights with respect to Parcel 9 for $62,881.75. The group received $1,000 as consideration for the option. The option was later extended to June 1, 1957, but *198 the realtor was unable to exercise it. Thereafter, and acting on his own initiative and in his own behalf, he informed the group that Liberal Markets, a Dayton shopping center concern, was interested in acquiring the group's option on this tract. Because the price offered was substantial and would result in a satisfactory profit, it was decided to sell. Third-Western Realty Company, sometimes hereinafter referred to as Third-Western, was a real estate holding company controlled by Liberal Markets. The group had no interest in Third-Western, either directly or indirectly, and had not prior to that time ever heard of it. Other than the dumping of refuse and fill dirt on parcel 9, it had not been improved. The group had not made any effort to sell its interest in Parcel 9. In the negotiations that followed Third-Western was represented by a Dayton attorney named James Froug, sometimes hereinafter referred to as Froug, and the group was represented by Pierce Wood, sometimes hereinafter referred to as Wood. Froug wanted additional assurances that Eckert, et al., would recognize the proposed assignment of the group's option rights to Thir-Western, and Wood wrote to John Shively, sometimes *199 hereinafter referred to as Shively, attorney for Eckert, et al., and notified him that the group intended to make a partial assignment of its option as to Parcel 9 only, and asked Shively to inform the proposed assignee that the partial assignment would be recognized by his clients. Shively did so on July 26, 1957, in a letter reading in part as follows: As per request of Coolidge, Wall & Wood, Attorneys for Frank J. Luchs, as agent and attorney for the Newcom heirs, owners of property optioned to Frank J. Luchs under date of November 21, 1952, this is to advise that the owners will recognize the proposed parcel assignment of option to your client, The Third-Western Realty Company, to cover Parcel #9. Mr. Luchs has perfomed the necessary prerequisites to exercise the option as to Parcel No. 9. If the same is assigned to your client the owners upon payment of the price of $1,550.00 per acre will execute and deliver their general warranty deed with release of dower as set forth in said option. The prerequisites referred to in the foregoing excerpt are the purchases of the first eight parcels. On July 30, 1957, Luchs and Grant, acting on behalf of the group, entered into a contract *200 with Third-Western, sometimes hereinafter referred to as the July contract, which read in part as follows: CONTRACT FOR PARTIAL ASSIGNMENT OF OPTION Whereas, on or about the 21st day of November, 1952, Virgil E. Eckert and others executed and delivered to Frank J. Luchs a written option, which thereafter was amended from time to time, hereinafter called the "Eckert Option," copies of which are attached hereto and marked Exhibit "A", to purchase a certain tract of land located in the City of Kettering, Montgomery County, Ohio; and Whereas, Clause 8 of the Eckert Option permits Frank J. Luchs to assign the same, NOW, THEREFORE, in consideration of their mutual promises, Frank J. Luchs agrees to make a partial assignment of the Eckert Option to The Third-Western Realty Company, and the latter agrees to pay for such partial assignment upon the following terms and conditions: 1. The premises to which the partial assignment shall be applicable are a part of Parcel No. 9 on the diagram attached hereto and marked Exhibit "B", which part shall consist of 14.915 acres, as described in Exhibit "C". 2. The purchase price shall be Fifty-three Thousand Eight Hundred Eighty-one and 75/100 Dollars *201 ($53,881.75), payable as follows: A. Eight Thousand Seven Hundred and Fifty Dollars ($8,750.00) in cash at the time of closing. B. Five promissory notes of The Third-Western Realty Company in the amount of Nine Thousand Twenty-six and 35/100 Dollars ($9,026.35) each, to mature on August 1, 1958, August 1, 1959, August 1, 1960, August 1, 1961 and August 1, 1962, respectively. The notes shall bear interest equal to the initial rate of interest which Frank J. Luchs, or his assignee, will be required to pay on bank loan on which these notes are pledged as collateral. 3. The transaction shall be closed, and the deed shall be delivered by the owners on or before September 3, 1957. 4. One Thousand Dollars ($1,000.00) heretofore paid by Robert E. Fahrendorf to Frank J. Luchs for an option upon said premises shall be credited against the Eight Thousand Seven Hundred and Fifty Dollars ($8,750.00) cash payment. 5. A real estate commission of Three Thousand Eight Hundred and Fifty Dollars ($3,850.00) will be paid to Brown, Fahrendorf and Brown by Frank J. Luchs. 6. It is understood and agreed that Frank J. Luchs is agreeing only to make a partial assignment of his right under the Eckert *202 Option, and that the purchase price of Twenty-three Thousand One Hundred Eighteen and 25/100 Dollars ($23,118.25) specified in the Eckert Option is to be paid by The Third-Western Realty Company. 7. Frank J. Luchs warrants that the zoning of the premises under the Kettering Zoning Ordinance is Business-1, the same zoning as that imposed upon the Swango tract at the southeast corner of Stroop and Shroyer Roads, City of Kettering. 8. Frank J. Luchs warrants that the Eckert Option is enforcible, and that by virtue of its provisions and of the assignment contemplated herein, The Third-Western Realty Company will be entitled to demand and receive a good and sufficient warranty deed, with dower rights, if any, released, conveying a clear, free and unencumbered title, except as to conditions, restrictions and easements of records. In the event of a breach of this warranty, The Third-Western Realty Company will have the right to demand the refund of any moneys paid to Frank J. Luchs hereunder. On August 29, 1957, at a closing held in Wood's office, the assignment called for in the July contract was made, and the group received a check for $8,750 and a promissory note for $45,131.75 as *203 payment for the assignment to Third-Western of its option rights. Froug also paid $23,118.25 to Shively, which amount was the price specified in the Eckert option for Parcel 9, based upon a cost of $1,550 per acre. Shively delivered to Froug a warranty deed conveying Parcel 9 from Eckert, et al., to Third-Western. As of the time of this proceeding, no shopping center has ever been constructed on Parcel 9. Third-Western still owns the parcel, with the exception of a corner lot which it sold to an oil company. In connection with the sale to Third-Western, the group paid expenses totaling $4,414.44, of which $3,624.34 represented a commission paid to the realtor arranging the sale. [5] The selling price was $53,881.75 and the total gain realized by the group was $49,067.31. Each petitioner reported his share of the gain on his Federal tax return for the year 1957 as a long-term capital gain. Respondent determined that all of the gain was taxable as ordinary income or, in the alternative, as short-term capital gain. The group acquired the property *204 interests from the Eckerts in the course of its business of developing and selling housing projects. At or about the time of their acquisition the group knew that a part of the land subject to its option was not suitable for the construction of houses thereon but was suitable for a shopping center, that it would rapidly increase in value for such purpose when a substantial number of houses were built on other areas of the land covered by the option and their sale, and that a profitable sale of their property interests in this area could and would be accomplished easily and without sales efforts on their part. The group anticipated that the development of the other areas would be completed in the immediate future. The anticipated rapid increase in the value of this area did occur. The gain realized by the group upon the sale of its option rights to Parcel 9 was derived from the sale of property held primarily for sale to customers in the ordinary course of their development business. Twinsburg Sometime in 1955 the group selected Twinsburg, Ohio, as the site for a large housing project, "a satellite city" of 2,000 to 3,000 homes, which would include a shopping center. Representatives *205 acting for the group entered into option agreements to purchase land or land-purchase contracts, as follows: Approxi-
Date of
Date of Land
Name
mate
Option
Purchase
of Tract
Acreage
Agreement
Contract
Owen
168
8- 1-55
Hawk
286
8-15-55
Lesko
103
10-10-55
Butler
58
10-31-55
Jackson
169
11- 1-55
Vavra
100
1-14-56
Crown Hill
79
9-19-56 All of the foregoing tracts of land were farmland then zoned for agricultural use and located on the outskirts of the village of Twinsburg. Pursuant to the usual procedure in carrying on their business, petitioners acquired options on the Hawk and Lesko tracts which provided that they could be exercised over a considerable time, first with regard to a parcel designated and numbered on a plat attached to each option which had been prepared by petitioners, then after a certain length of time, with regard to another numbered and designated parcel, and so on. Petitioners also had the right to assign their option rights. Thus each parcel could be acquired by one of petitioners' marketing corporations and the first could be partially developed before the acquisition of the second, and so on. Shortly *206 after the group acquired the Owen, Hawk, and Lesko options, Chrysler Corporation announced that it was going to build a large stamping plant, employing approximately 3,500 people, northeast of the Lesko tract. Immediately after the announcement by Chrysler Corporation a representative of Manor Real Estate Company, sometimes hereinafter referred to as Manor, asked the group for an option on the Hawk and Lesko tracts. Manor, a subsidiary of the Pennsylvania Railroad Company which claimed the right of eminent domain, wanted the land to lay a railroad spur track from the Pennsylvania's main line to the Chrysler plant site. At or about the same time representatives of Ohio Edison Company, sometimes hereinafter referred to as Edison, which also claimed the right of eminent domain, asked the group for a power line easement over the Hawk and Lesko tracts. Edison planned to run a high tension power line across the Hawk tract to the Chrysler plant, and it also needed a site for a power substation. As a result of these developments, the group abandoned its plans to build houses on the Hawk and Lesko tracts, and on November 3, 1955, three agreements were executed giving Manor options to acquire *207 the option rights held by the group in the Hawk and Lesko tracts. The first agreement pertained to all of the Hawk tract, the second to parcel 3 of the Lesko tract, and the third to all of the Lesko tract or, at its election, to parcel 2 thereof. Under the terms of the group's option agreement with the owners of the Lesko tract, that tract had been divided into four rectangular parcels, the southwest portion being designated as parcel 1, the northwest portion was parcel 2, the northeast was parcel 3, and the southeast portion was designated parcel 4. On January 18, 1956, the group was notified by Manor that it intended to exercise its option to purchase parcel 3 of the Lesko tract. Pursuant to its obligation under a clause in its assignments of option rights to Manor, the group had to exercise its option to the entire Lesko tract, and convey by deed to Manor the parcel which it elected to receive. On March 8, 1956, the group received a deed to the entire tract, and paid the agreed purchase price to the grantors. On May 10, 1956, the group conveyed parcel 3 to Manor for $80,710.06, incurring expenses in connection with the sale amounting to $103.55. The total gain realized by the *208 group was $60,055.84, and each petitioner reported his proportionate share of this gain in his return for the year 1956 as short-term capital gain. Respondent has determined that this gain was ordinary income, a determination which does not, in the case of these petitioners, affect the tax liabilities asserted against them for the taxable year 1956. On September 10, 1956, Manor notified the group in writing that it intended to exercise its option rights with respect to parcel 2 of the Lesko tract. On September 14, 1956, the group sold parcel 2 of the Lesko tract to Manor for $75,870.38, incurring expenses in connection with the sale amounting to $108.60. Each petitioner reported his proportionate share of the $56,461.79 gain realized as a long-term capital gain on his tax return for the year 1956. Respondent determined that the gain was ordinary income. The Pennsylvania Railroad built the spur track across parcels 2 and 3 of the Lesko tract, and permitted Edison to build its power substation on parcel 3. Sometime during the year 1956 the group granted Edison a 100-foot easement for a high tension power line across the Hawk tract. In the same year, acting on its own motion, the *209 village of Twinsburg rezoned much or all of the land assembled by the group from agricultural to industrial use, excluding residential development of the land. The group also obtained options on three separate tracts of land zoned for agricultural use and located northeast of the Chrysler plant, but it was unable to get satisfactory zoning and permitted its options to expire. These tracts were as follows: Total
Holding
Loss by
Name
Period
Acreage
Group
Chamberlin
5-17-56 to 5-17-57
136
$2,000.00
Millen
5-24-56 to 2-10-57
170
5,329.00
Schmalze
3-11-57 to 7-11-57
63
500.00 Each petitioner reported his proportionate share of these losses as short or long-term capital losses, depending upon the holding period, and respondent once again determined that these losses were ordinary and not capital losses. Sometime during the year 1956 the group purchased the Hawk, Vavra, Jackson, and Butler tracts, as well as part of the Owen tract. Crown Hill wa purchased in 1957, and the remaining portions of the Owen tract were purchased in 1957 and 1958. On May 7, 1956, Grant wrote a letter to Manor offering to sell "the land in our proposed industrial *210 park" for $1,750,000. He stated in the letter that "the land was originally acquired for housing development and could still be used for that purpose, however, we now feel its only correct use is for industrial purposes." He offered further to lease the land to the Pennsylvania Railroad at "six per cent net on the $1,750,000 valuation for a period of not less than twenty years, with an option to renew on the basis of a reappraisal at the end of the lease period." Neither offer was accepted, and as of the date of these proceedings the group still owned all of the Twinsburg lands with the exception of the two parcels sold to Manor. No houses have been built upon it, it has not been improved in any manner, and it has not been advertised for sale. At the time of the trial herein, the group had no plans to develop it or to "actively pursue the sale of it." Petitioners' property interests in parcel 2 * of the Lesko tract were held primarily for sale to customers in the ordinary course of petitioners' development business, and the gain realized by the group upon the sale of this property to Manor is taxable as ordinary income. *211 The Rayen Tract On or about May 1, 1954, Luchs, acting for the group, acquired an option to purchase a vacant tract of approximately 206 acres located on the outskirts of Youngstown, Ohio, which, at that time, was owned by the Rayen Company, sometimes hereinafter referred to as Rayen. Petitioners acquired their property interests therein for the purpose of developing this tract to the extent feasible by the construction thereon of a large housing project. The Rayen tract, as it will sometimes hereinafter be referred to, was divided into eight consecutively numbered rectangular parcels, most of which were zoned for residential use. A strip along one street and a portion of two adjoining parcels numbered 5 and 7 were zoned for commercial use. The group never applied for or received any change in the zoning of the Rayen tract. The group initially planned to build some 700 houses on the Rayen tract, and in the early spring of 1955 Grant prepared a preliminary development plan for the entire tract. He designated the southern portion of parcels 5 and 7 for use as a shopping center. The group believed that to be the highest and best use of this particular land. The members of the group *212 did not intend to build or operate such a shopping center themselves but intended to sell their interests in this area for such use in connection with their development and sale of the housing projects. They anticipated a rapid increase in value of this area and an easy, quick and profitable sale thereof for the reasons set out in our findings with regard to the Eckert tract. The group exercised its option rights and purchased parcel 1 of the Rayen tract on October 1, 1954. It purchased parcel 3 and the western half of parcel 5 on June 20, 1955. The parcels purchased were deeded to Luchs, who in turn assigned them to two controlled corporations, which built 153 houses on the land and held the houses for sale to the public. No houses were built on a small strip of land, sometimes referred to as the "spear-shaped parcel," located on the western edge of the western portion of parcel 5, title to which strip remained in a nominee of the group. Numerous delays and difficulties, some political in nature, caused the Youngstown project to be unsuccessful, and the houses were eventually sold at a substantial loss. Sometime during the year 1955 Grant was introduced to William J. Cafaro. He *213 told Grant that he was interested in negotiating with the group for the acquisition of the proposed shopping center site in the Rayen tract. Nothing was done at that time, but Cafaro subsequently learned that another builder was planning a shopping center near the Rayen tract. Cafaro regarded the Rayen tract as a superior shopping center site and he offered to purchase the group's option rights to the site if the transaction could be carried out promptly. The site consisted of the "spear-shaped parcel" located on the western half of parcel 5 and the so-called "nineteen acre parcel," comprising the southeast quarter of parcel 5 and the southern half of parcel 7. The group had acquired ownership in fee of the "spear-shaped parcel" on June 20, 1955, but held only an option to purchase the "nineteen acre parcel." As a condition to Cafaro's offer, the group agreed to take, as a part of the purchase price, a poorly drained, marshy area of 14 acres contiguous to the Rayen tract, which Cafaro had acquired to prevent a competitor from using it as a shopping center site. Cafaro's corporation, Lincoln Knolls Plaza, Inc., sometimes hereinafter referred to as Plaza, acquired the 14-acre parcel, *214 sometimes hereinafter referred to as the Cafaro tract, during late 1955. Sometime late in the year 1955 Luchs, again acting for the group, entered into an undated agreement with Plaza and Cafaro. The agreement, labeled "Agreement to Sell Option Rights" in which Luchs was referred to as "Seller" and Plaza as "Purchaser," provided in part as follows: Seller hereby agrees to execute, simultaneously with this agreement, an assignment to the Purchaser of Seller's options [option] rights to acquire from the Rayen Realty Company, Inc., Cleveland, Ohio, the following described Parcels of land: PARCEL "A" * * *
PARCEL "B" * * *
In exchange for the assignment of said option rights, the Purchaser shall convey to the Seller a fee simple title to Youngstown City, Out Lot No. 1624 and part (3.72 acres) of Out Lot No. 1623 (said Out Lots having a combined frontage of 752 feet on McCartney Road, U.S. Rt. 422, and about 872 feet on Lamar Avenue, and containing approximately 14.43 acres, more or less), and two promissory notes in the amount of $47,800 each, made by Cafaro and his wife, Alice Cafaro, one of which shall be payable on or before the 1st day of July, 1956, the other *215 payable on or before the 1st day of July, 1957, and both of which bear interest from date at a rate of four and one-half (4 1/2%) per annum. Said notes shall contain a provision whereby Purchaser shall have the right of first refusal to discount them at the prevailing discount rates offered by loan institutions at the time of their discount. However, in no event shall said notes be discounted in any bank in the Youngstown or Warren area. 2. It is understood and agreed that the option rights to be assigned constitute a part of two larger parcels numbered 5 and 7 embraced in a certain option agreement between the Seller and The Rayen Company dated May 1, 1954, and that whenever the Purchaser is ready to exercise its option, the Seller will exercise its option to acquire the remaining property embraced in said larger parcels. It is further understood and agreed that at the time of the acquisition of said property from The Rayen Company, the Purchaser will be required to pay for said property the sum of $25,000 in cash, and that the Seller will pay for the remaining property in said parcels the sum of $6,250, in cash and total interest and taxes due to the date of settlement as per Seller's *216 agreement with The Rayen Company. * * *
6. Promptly after the execution of this agreement, Seller agrees to deposit the above assignment of said option rights with The Land Title Company of Youngstown, Ohio, in escrow, subject to compliance with all of the provisions of this agreement, and promptly thereafter, the Purchaser and Cafaro agree to execute and deliver a deed for the property agreed to be conveyed as set forth in paragraph 1 hereof and will execute the notes therein provided, and will deliver to the escrow agent $25,000, in cash, to be paid to The Rayen Company upon the exercise of the assignment of said option rights. Settlement shall be made at a time agreeable to the parties but not later than April 15, 1956. The above described promissory notes shall bear date as of the day of settlement. Upon settlement, the deeds and mortgage instruments shall be recorded by the escrow agent and the promissory notes shall be delivered to the Seller. All escrow fees and costs shall be paid 50% by the Purchaser and 50% by the Seller. 7. This agreement, together with the assignment described herein, shall constitute the complete agreement of the parties and the terms, conditions, *217 and provisions of any previous agreement, written or oral, between Cafaro and the Seller shall be deemed to have been completely rescinded and shall be held for naught. * * *
Then, on January 5, 1956, Luchs executed another instrument entitled "Assignment of Option Rights" by which he assigned to Plaza "all of his right and option" to purchase the portions of the Rayen tract described in the above-quoted agreement, which rights Luchs possessed by virtue of the option he acquired from the Rayen Company in 1954. The Rayen option contained a provision that "there shall be no assignment or transfer of this agreement, or any part thereof, without the written consent of the Rayen Company endorsed thereon although it is hereby agreed that such consent shall not be arbitrarily withheld." The group furnished a copy of the January 5, 1956, "Assignment of Option Rights" to Rayen's president, who turned it over to Rayen's attorney. The attorney revised the metes and bounds descriptions and prepared a new assignment of option rights, copies of which were sent to members of the group for execution. On April 14, 1956, Luchs, acting for the group, and Plaza executed the revised "Assignment *218 of Option Rights" prepared by Rayen's attorney, which read in part as follows: KNOW ALL MEN BY THESE PRESENTS: That the undersigned, Frank J. Luchs, of the City of Washington, District of Columbia, hereby, for valuable consideration in hand paid and hereby acknowledged, transfers, sets over and assigns to Lincoln Knolls Plaza, Inc., a corporation engaged in business in the State of Ohio, all of his right and option, under that certain Option Agreement with The Rayen Company, a corporation, under the agreement of May 1, 1954, to purchase the following property, being a part of Parcels Nos. 5 and 7, as described in said Option Agreement: * * *
In connection with said Assignment, and as part consideration thereof, the undersigned, Frank J. Luchs, as Assignor, and Lincoln Knolls Plaza, Inc., as Assignee, hereby agree as follows: 1. Simultaneously with the exercise of this option by the Assignee, the Assignor agrees to exercise his option to purchase the remaining parts of Parcels Nos. 5 and 7, the Assignor having previously exercised his Option and acquired one-half of Parcel No. 5. The total purchase price under said Option being $31,250, the Assignee agrees to pay $25,000 *219 to The Rayen Company for the property to be acquired by it, and the Assignor agrees to pay the balance of $6,250 for the property to be acquired by him. 2. The Assignee shall have the benefit of all the provisions of said agreement of May 1, 1954, with respect to the acquisition of said property, including, but not to be limited to the right to receive a limited abstract of title or a title guarantee to said property showing good and marketable title thereto except restrictions, reservations and conditions of record, including all zoning and other similar provisions; and all other provisions of said agreement for the benefit of the holder of said Option. * * *
Rayen did not execute a formal written consent to the assignment of the group's option rights, although the conduct of its counsel and officers was such that it indicated consent to the assignment. In drafting the various documents, the fact that the group owned the "spearshaped parcel" in fee was overlooked. Sometime prior to April 19, 1956, the mistake was discovered, and Grant executed a deed conveying the "spear-shaped parcel" to Plaza, which deed he placed in escrow along with the funds necessary to pay for the *220 portions of parcels 5 and 7 of the Rayen tract which were not being taken by Plaza under its assigned rights to the group's option. Cafaro, acting for Plaza, deposited in escrow the funds needed to purchase the "nineteen-acre parcel" from Rayen, the two notes payable to the group, and a deed to the Cafaro tract. Rayen's attorney prepared deeds conveying the "nineteen-acre parcel" to Plaza, and the residue of parcels 5 and 7 to Luchs, as nominee for the group. On April 19, 1956, a closing was held at which Rayen, in exchange for the funds held in escrow gave Plaza a deed to the "nineteen-acre parcel" and the group a deed to the residue of parcels 5 and 7. At the same time the group gave Plaza the deed to the "spearshaped parcel $" and received a deed from Plaza to the Cafaro tract and two notes which were executed by Cafaro. For Federal income tax purposes a total gain of $119,801.40 was realized by all members of the group in 1956 on the sale made by the group to Plaza. The group paid expenses totaling $10,198.60 [6] in 1956 with respect to the sale, including an amount of $9,983, representing the cost of an outfall sewer servicing the tract, which amount resulted from allocating *221 18/75 of the total cost to the portion sold to Plaza. Each petitioner reported his proportionate share of the gain realized on this sale on his Federal income tax return for the year 1956. Respondent determined that petitioners realized ordinary income from this transaction or, in the alternative, shortterm capital gains. At the time of the sale the property sold to Plaza was being held by the group primarily for sale to customers in the ordinary course of its development business, and the gain therefrom constituted ordinary income. Standard Oil Company In the summer of 1956 a representative of the Standard Oil Company of Ohio was looking for a filling station site near the Rayen tract. He approached the real estate broker who was acting as sales representative for petitioner's *222 housing project. At that time the group had no plans for the tract, and it had not placed any "For Sale" signs on it. Although he had not been authorized to seek buyers for any part of the tract, the salesman obtained an offer from Standard Oil which he transmitted to the group. After some negotiation as to price, an option agreement was executed on August 11, 1956, using Standard Oil's regular option form, by which the group gave Standard Oil an option to buy a 200-foot square section of the Cafaro tract, which was zoned for commercial use, for $18,000. The option was exercised by Standard Oil on October 29, 1956, and on December 10, 1956, the sale was closed. The group realized a total gain of $14,967.64 on the sale and the expenses connected with the sale amounted to $947.30, of which $900 was a commission paid to the salesman. Each petitioner reported his proportionate share of the gain realized as a long-term capital gain. Respondent determined that the entire amount was taxable as ordinary income. This gain was long-term capital gain and was not realized from the sale of property held for sale to customers in the ordinary course of petitioner's trade or business. Opinion
*223 KERN, Judge: The four issues involved in this case all present the question of whether the gains admittedly received by petitioners as a result of four separate transactions constitute ordinary income (or, in the alternative, short-term capital gains) as determined by the respondent, or long-term capital gains, as contended by the petitioners. Both parties are agreed that this question is essentially one of fact. See Rubino v. Commissioner, 186 F. 2d 304 (affirming a Memorandum Opinion of this Court), certiorari denied 342 U.S. 814. Consequently the issues have been disposed of by our findings herein. In general, the factual background of this case is as follows: Petitioners joined together in the conduct of the business of acquiring controlling interests on large tracts of unimproved land located at advantageous sites, to develop this land by creating thereupon large "housing projects" in connection with which provision was frequently made for the use of certain areas as shopping centers, and to thereafter dispose of their real estate holdings at a profit. As convenient machinery for the carrying on of this business they frequently acquired and occasionally *224 disposed of their interests in such real estate by obtaining (or assigning) options, organized and utilized a corporation for the development of the land and the construction of houses, and organized and utilized a number of subsidiary corporations for the purpose of taking title to parcels of land upon which houses were to be constructed and of selling these houses. The ultimate gain from all of the transactions taken as a whole, however, was to be shared equally among the individual petitioners and constituted the profits from their real estate business. See Walter H. Kaltreider, 28 T.C. 121, aff'd 255 F. 2d 833. While petitioners did not intend to build and operate the shopping centers themselves or through any of their creature corporations, they did intend to sell their interests in the land designated for this purpose to others who would construct such shopping centers. Shopping centers were frequently provided for in such housing projects and petitioners anticipated a rapid increase in the value of the areas suitable for such shopping centers and their easy and profitable sale. We consider immaterial the fact that in some instances the petitioners' *225 interests in real estate were disposed of by means of assignments of options to purchase and in others by conveyances of the title to the land itself after they had themselves exercised the options. In both cases petitioners disposed of their interests in the land and the purchasers acquired title. In substance the same result was achieved and the same business purpose was accomplished. See section 1234(a), Internal Revenue Code of 1954; Regs. section 1.1234-1(a)(3). In their argument on the issues involving the sale of their interests in areas for shopping centers, petitioners rely heavily on Eline Realty Co., 35 T.C. 1, and Charles E. Mieg, 32 T.C. 1314. These cases are distinguishable on their facts but the reasoning apparent in each case indicates that a result adverse to the contentions of the petitioners should be reached in this case. In Eline Realty Co., supra, the real estate involved was an irregular, narrow strip of land which unexpectedly was left in the hands of the owner-developer by reason of circumstances arising during the course of development. The size and dimensions of this strip "made any subdivision, *226 development or construction unfeasible." The only potential buyer of this property would be the owner of contiguous real estate and only if and when such real estate were developed. This development and the sale of the strip did not occur until some 16 years after its acquisition. In Charles E. Meig, supra, the rationale is sufficiently indicated by the following quotation from the option (p. 1321): The evidence persuades us that the rapid increase in value of [its undeveloped part of the real estate involved] was attributable to [the unexpected erection of a country club by parties other than the taxpayer on neighboring land], and that the original intention accompanying the venture's acquisition of such mountain land was to hold it for an extended period as an investment with the hope that an ultimate enhancement in value would provide the opportunity for profitable disposition. Although there is other evidence in the record, stressed by respondent, which could lead to the conclusion that petitioners anticipated the very rapid increase in value that actually occurred, we think, on the whole, that the balance tips in favor of the petitioners in this respect. *227 In the instant case the areas in question were intended from the start of the several ventures to be disposed of to persons who would use them for the erection of shopping centers, such dispositions were intended by petitioners to be made within a relatively short time after the ventures were begun and as a part of the conduct of the venture, the petitioners anticipated a rapid increase in value of such areas for that purpose, and such rapid increase in values actually occurred by reason of petitioners' own business activities resulting in the quick, easy and profitable sale of petitioners' interests in these areas as a part of petitioners' several real estate ventures. On the record before us we have concluded that petitioners' gains from such sales constituted gains from the sale of property held primarily for sale to customers in the ordinary course of petitioners' business and were taxable to them as ordinary income. We have reached the same conclusion with regard to the gains realized by petitioners from the sale of their interests in a large acreage from the so-called Twinsburg tract, consisting of certain parcels covered by the option on the Lesko land. Petitioners' interests *228 in this land were acquired for the purpose of developing it as one of their housing projects and then selling it to customers. This is not disputed and is indicated by the option providing that it might be exercised by parcels as designated in a plat attached thereto which had been prepared by the petitioners. Immediately after their acquisition, petitioners' interests in this land were held by them for use in their business and for ultimate sale to customers in the ordinary course of their business. Before further development of this land could be made, events transpired which caused petitioners to sell their interests in this land "in bulk". In our opinion these sales constituted sales of property held by petitioners for sale to customers in the ordinary course of their business and were ordinary income. Donald J. Lawrie, 36 T.C. 1117; August Engasser, 28 T.C. 1173. See, also, Carter-Colton Cigar Co., 9 T.C. 219. With regard to the sale of their interests in the filling station site on property acquired from Cafaro, we are of the opinion that the gains realized therefrom are capital gains. This property was not acquired by them for the *229 purpose of use, development and sale in their business of constructing and selling housing projects. They were not in the general real estate business of buying and selling isolated pieces of real estate. They did not buy it with the anticipation of a rapid increase in value and a quick sale. They took it more or less involuntarily as a necessary but not desirable step in the sale of other property and intended to hold it for an indeterminate period with the hope of ultimately selling it at an advantageous price. As to this property we conclude that petitioners held it as investors and their gain upon its sale constituted long-term capital gains. Decisions will be entered under Rule 50. Footnotes
*. Proceedings of the following petitioners are consolidated herewith: Wallace F. Holladay and Wilhelmina Cole Holladay, Docket No. 87270; Henry J. Kaufman and Irma N. Kaufman, Docket No. 87271; Frank J. Luchs and Elizabeth K. Luchs, Docket No. 87272; and Maurice D. Rosenberg, Jr., and Charlotte R. Rosenberg, Docket No. 87273.↩
1. Revness is not a petitioner in this proceeding.↩
2. Luchs and Rosenberg signed the September agreement on behalf of Kaufman and Revness, respectively, as well as in their own behalf.↩
3. This was subsequently amended to read: "on or before May 1, 1953."↩
4. Similar provisions gave petitioners the right to purchase the other parcels on similar terms at approximately 6 months intervals.↩
5. There is no explanation in the record for the discrepancy between the amount paid and the commission specified in the July contract.↩
*. By official order of the Tax Court, dated June 14, 1963 and signed by Judge Kern, the court's opinion, filed June 11, 1963, was amended by striking the numeral 3 and inserting therefor 2.↩
6. Another $107 was paid in connection with this transaction in 1957, and each petitioner claimed his proportionate share of that amount as a long-term capital loss on his Federal tax return for that year. Respondent determined that the loss so reported was allowable as an ordinary loss. This issue, if it be an issue, is governed by the same considerations and controlled by our decision re the Rayen tract.↩