CLIMATE CONTROL, INC., SUCCESSOR BY MERGER TO AFTON BUILDERS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent.Climate Control, Inc. v. CommissionerDocket No. 4344-70United States Tax CourtT.C. Memo 1974-206; 1974 Tax Ct. Memo LEXIS 112; 33 T.C.M. (CCH) 920; T.C.M. (RIA) 74206; August 6, 1974, Filed. Robert E. Schlusser, for the petitioner. Howard W. Gordon, for the respondent. BRUCE MEMORANDUM FINDINGS OF FACT AND OPINION BRUCE, Judge: The Commissioner determined a deficiency in the Federal income taxes of J & D, Inc. (hereinafter referred to as J & D) for the fiscal year ending February 28, 1967, in the amount of $23,426.69. J & D was merged into Afton Builders, Inc. (hereinafter referred to as Afton Builders) on January 11, 1968. The petition herein was filed by Afton Builders, as successor to J & D, on July 6, 1970. Afton Builders was merged into Climate Control, Inc. in November 1970, and on May 22, 1973, this Court granted a motion for the substitution of Climate Control as the petitioner herein. The sole issue for determination is whether certain real estate sold by J & D, Inc. in fiscal year 1967*113 was held by it as a capital asset or as property held primarily for sale to customers in the ordinary course of its trade or business. Some of the facts in this case have been stipulated and are so found. FINDINGS OF FACT J & D was incorporated under the laws of the State of Delaware on February 1, 1962. J & D was on the completed contract method of accounting and had a fiscal year ending on February 28. It filed its Federal income tax returns with the district director of internal revenue, Wilmington, Delaware. During the fiscal year 1967, J & D was one of a group of several brother-sister corporations, in which Daniel D. Rappa, individually or with Victor A. Miller, held a majority interest. All of these corporations, including J & D, Afton Builders, and Climate Control, had their principal places of business in Wilmington, Delaware. Prior to its merger into Afton Builders, J & D had outstanding 100 shares of no par common stock, of which Rappa owned 52 shares and Miller owned 48 shares. In the fiscal year 1967 Rappa served as president of J & D and Miller served as vice president. From the time of its formation in 1962 until it was merged into Afton Builders, *114 J & D was engaged in the business of buying, developing, and selling real estate. Throughout its existence J & D purchased and developed tracts of unimproved property located in New Castle County, Delaware, which it would later sell either as one improved tract or as single-family lots. In addition, J & D owned certain real property which it leased to its related corporations for use in their businesses. As president of J & D, Rappa had the primary responsibility to locate properties to be developed, to deal with the zoning and financing of these properties, to work with engineers for site locations and plot plans, and to arrange for financing for the construction of buildings on the acquired property. As president of J & D, Rappa made decisions to purchase property wtihout consulting Miller. As vice president of J & D, Miller assisted Rappa and performed those duties which Rappa could not find time to complete. Rappa was originally a plumber who in 1950 started his own heating and plumbing contracting business. As the plumbing and heating business became more successful, Rappa entered into construction and real estate development through his various corporations. In 1959*115 he brought Miller into the business because he felt that Miller had a good knowledge of heating, air conditioning, and construction. In 1963 Rappa, as president of J & D, first became interested in a tract of raw land known as the Hillendale property, consisting of approximately 20 acres which lay south of, but adjacent to Interstate Highway 95 and north of Silverside Road, Newcastle County, Delaware. The property was inaccessible from Interstate 95 and was apparently denied access to Silverside Road by virtue of intervening land owned by the Capuchin Order, a monastic order. Access to the tract was over the streets of Hillendale, a residential development adjacent to the tract to the south. The land was first brought to Rappa's attention as a suitable site for the construction of single-family homes. However, Rappa thought that because of the rock structure of the property and the apparent inaccessibility of major roads, the development and sale of the property as single family lots would not be profitable. Accordingly, Rappa turned down the initial opportunity to purchase the land. However, after first turning down the opportunity to purchase the property, Rappa later*116 visited the property several times, trying to determine a possible use for the land. He was still interested in the land because he believed the asking price and the terms of purchase to be very reasonable. Finally he concluded that the land would be a good location on which to build and rent apartments. He had two reasons for this conclusion. First, he believed that the market was good for apartments because home construction had slowed down and, second, the property had a good view for apartments, overlooking the Delaware River. Thus, Rappa contacted a realtor and asked him if he would approach the owner, National Builders, Inc., with an offer of purchase. Shortly thereafter, National Builders orally agreed to sell the property. At that point Rappa told Miller of the proposed transaction and Miller concurred in the decision to purchase the land. On December 23, 1964, J & D executed a contract of purchase whereby it acquired the Hillendale property from National Builders, Inc.J & D acquired the property subject to a $45,967.50 mortgage and agreed to pay National Builders, Inc. $50,000. Settlement was held on February 24, 1965. At the time of purchase, the Hillendale*117 property was zoned R-2, which did not permit the construction of apartments. Accordingly, Rappa contacted an engineer, Howard Robertson, to have a survey prepared as well as the necessary drawings to submit with an application for a change in zoning. Rappa also contacted J & D's attorney, Frank O'Donnell, to have a title search made and to have the necessary papers prepared to submit a petition for rezoning. On January 12, 1965, J & D filed an application with the New Castle County Zoning Commission to change the zoning of the Hillendale property to R-4, which would permit the construction of apartments on the land. Since settlement had not as then been held on the sale, the application to the Zoning Commission was made by J & D as equitable owner. The Zoning Commission was an advisory body on zoning changes to the county governing body, the Levy Court. A public hearing was held before the New Castle County Zoning Commission on January 27, 1965. As a result of the public hearing, the Zoning Commission recommended to the Levy Court that the requested rezoning be denied. The Zoning Commission recommended denial because the Hillendale property was bounded by undeveloped land, *118 single family developments, and a monastery, and because the development would greatly increase traffic volume through the existing Hillendale and Northridge developments. After the Zoning Commission recommended denial of J & D's application, Frank O'Donnell discovered the existence of a right-of-way from the Hillendale property to Silverside Road. Since the Zoning Commission had originally recommended denial partially because the apartment development would cause excessive traffic through the existing developments, O'Donnell recommended that J & D explore the possibility of expanding the right-of-way to the Silverside Road. Accordingly, in September 1965 J & D contacted the owners of the property adjacent to the right-of-way, the Van Trumps and the Capuchin Monks. Shortly thereafter J & D entered into negotiations with the Capuchin Monks over the right-of-way and after some months of negotiations, on January 24, 1966, J & D and the Capuchin Monks entered into an agreement whereby the existing right-of-way was expanded by 30 feet, thereby increasing the right-of-way to 50 feet. The agreement allowed J & D to construct a road from its property to Silverside Road. After*119 obtaining this agreement, J & D again applied for a rezoning of the property. On March 29, 1966, the Zoning Commission recommended rezoning to R-4 and the Levy Court adopted this recommendation and granted rezoning. Within a few days after J & D received the zoning change on the Hillendale property, Miller had a meeting with a contractor for whom one of J & D's related corporations had performed heating and air-conditioning services. The contractor shared offices with William F. Steffenberg, a licensed real estate salesman and broker. While at the offices, Miller incidentally encountered Steffenberg. At that time Miller and Steffenberg engaged in a brief, casual conversation in which Steffenberg congratulated Miller on obtaining the zoning change for the Hillendale property. Steffenberg also inquired if Miller and Rappa had any property they wished to sell. In response, Miller, in a jocular manner, indicated that if Steffenberg wished something to sell he could sell the Hillendale property. At that time Steffenberg was experiencing financial difficulties in his real estate brokerage business and was eager to consummate a transaction. Moreover, he had been working with Elliott*120 Unterberger, a Philadelphia real estate broker and attorney, in order to sell Rieder-Haas Enterprises, Inc., a Philadelphia concern, property on which to build apartments. Previously, he had shown three or four unacceptable sites to Rieder-Haas. As a result of his meeting with Miller, Steffenberg contacted Unterberger in regard to the Hillendale property and on April 5, 1966, Unterberger wrote Steffenberg saying that Rieder-Haas was "definitely willing to enter into an Agreement of Sale, provided all the facts check out." Steffenberg then contacted Rappa to get his permission to show the property to Unterberger and representatives of Rieder-Haas Enterprises, Inc. As a result of Steffenberg showing the property to representatives of Reider-Haas on April 6, 1966, Unterberger wrote Steffenberg a letter setting out a proposal to purchase the property at a purchase price of $300,000.Unterberger also enclosed a $5,000 "good faith deposit check." However, J & D did not immediately accept the offer and the parties negotiated during the next two months. On June 8, 1966, J & D and Rieder-Haas Enterprises, Inc., entered into a contract of purchase whereby J & D would sell the Hillendale*121 property for $325,000. This June 8th agreement, however, was terminated by mutual consent of the parties and was replaced by another agreement signed August 2, 1966, wherein J & D agreed to sell the property for $290,000. The August 2nd agreement was subsequently modified by a supplemental agreement dated January 26, 1967. Settlement was held on January 26, 1967. As a result of the transaction, J & D paid commissions to Steffenberg and Unterberger in the amount of $18,600. J & D reported the sale of the property on its corporate income tax returns for fiscal year 1967 showing a sales price of $280,000, a basis to J & D of $175,079.83 and a resultant gain of $104,920.17. J & D reported the gain on its Federal corporate income tax return as long term capital gain. From the time J & D entered into a contract to purchase the Hillendale property from National Builders, J & D or its officers took several actions in regard to the land. At J & D's direction, Howard L. Robertson, an engineer, prepared a preliminary apartment layout encompassing 32 buildings and 352 apartments. The layout proposed buildings, parking, recreational locations and streets. The layout was later amended*122 on March 4, 1965, when Robertson added information that he had obtained from test borings of the earth of the tract. The test borings were designed to determine the composition of the earth and to determine if it would present any difficulty in construction. In addition, Rappa or his agents had several meetings with officials of the Suburban Water Company in regard to a preliminary survey of water lines. The culmination of the meetings came in June 1966 or thereafter when a preliminary survey was drawn by employees of the water company. However, due to the fact that J & D at the time of preparation of the plan had engaged in serious negotiations to sell the land or had entered into a contract for sale, the survey was prepared for "Top of the Hill Apartments," the name used by the purchasers. J & D also directed Howard L. Robertson to prepare a topographic map showing tree lines and proposed twelve-inch sewer mains. Although the map bore the name of J & D, it was not completed until August 17, 1966, after J & D had entered into a contract of sale. Work on the map had started 60 to 90 days earlier. At some time during J & D's ownership of the Hillendale property, William Cornell, *123 an employee of J & D, examined prints and visited other sites to determine the type of apartments that J & D planned to eventually construct. At some time during J & D's ownership of the property, Rappa, acting as president of J & D, contacted William Malanga of Gilpin, Van Trump and Montgomery, mortgage brokers, in regard to obtaining a mortgage for construction. The contact did not consist of a formal request but rather Rappa took the site plan to Malanga's office and asked him what he thought of the possibilities of obtaining a mortgage for the construction of apartments on the Hillendale property. As a result of the meeting between Rappa and Malanga, Malanga contacted Erskin White, regional supervisor for Metropolitan Life Insurance Company in Eastern Pennsylvania and Delaware during 1965 and asked him to look at the Hillendale property. White accompanied Malanga to the property and reviewed plot plans but White felt that Malanga's referral with respect to the Hillendale property was premature because there was an insufficient development of ideas and plans. However, while White believed the contact was premature, he did feel that the Hillendale property would be suitable*124 for a loan. He also felt that such inquiry was bona fide. Moreover, White believed that Malanga had made similar premature contacts on other occasions. J & D's returns showed income for the taxable years ending February 28, 1963 through and including February 28, 1967 as follows: Taxable Year EndingGross Profit from sales of landRentalOtherNet Gains otal 2-28-63--$4,675----$ 4,6752-29-64--4,800$10--4,8102-28-65$18,4404,80018--23,2582-28-6680,7744,800----85,5742-28-6738,1455,670--$104,920148,735J & D listed in its returns for the taxable years ending J & D listed in its returns for the taxable years ending February 28, 1963 through and including February 28, 1967, on Page 4, schedule L, "Other Investments," "Buildings and other depreciable assets" and "Land" as of the close of each taxable year as follows: Taxable Year EndingOther InvestmentsBuilding & Other Depreciable AssetsLand 2-28-63- 0 -$32,778.40$ 1,000.002-29-64- 0 -32,778.40124,441.782-28-65- 0 -33,384.65364,602.222-28-66- 0 -58,507.86305,545.432-28-67- 0 -58,507.86119,649.46*125 J & D had net income and accumulated earned surplus as follows: Fiscal Year EndingNet Income, i.e. Taxable Income minus TaxesAccumulated Earned Surplus 2-28-63$ 804.54$ 804.542-29-641,121.461,926.002-28-653,009.744,935.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,674.8837,610.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,075.29133,685.91J & D's liquid assets were as follows: Taxable Year EndingCashNotes ReceivableSample HousesOther Current AssetsLoans to Stockholders 2-28-63$153.90$ 1,000.00- 0 0$1,860.00- 0 -2-29-64259.501,700.00- 0 -200.00- 0 -2-28-65177.645,366.53$33,065.50200.00$ 480.002-28-66312.138,000.00- 0 -8,180.56480.002-28-67476.30105,225.00- 0 -8,455.4213,000.00In developing one of J & D's single-family lot developments, the Afton Development, J & D and Afton Builders employed the following procedures in constructing and selling houses after J & D had developed the land. First, Afton Builders would obtain a purchase contract for a house and lot from a prospective purchaser which Afton Builders would take to a bank to obtain financing for the house to be constructed. Next, Afton*126 Builders would purchase the building lot from J & D and would build the house upon the lot. Finally, after completing construction of the house, Afton Builders would convey the house and lot to the purchaser. OPINION The sole issue for determination is whether the Hillendale property was a capital asset within the meaning of section 1221 of the Internal Revenue Code of 1954, 1 or whether the property was held primarily for sale to customers in the ordinary course of business. If such property is held to be a capital asset J & D will recognize a capital gain, and if not, the gain will be ordinary income. *127 Section 1221(1) excludes from the definition of a capital asset "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." The question of whether property is a "capital asset" or "held * * * primarily for sale * * *" is one of fact and must be decided on the circumstances peculiar to each case. William B. Howell. 57 T.C. 546 (1972); W. T. Thrift, Sr., 15 T.C. 366 (1950). Because the capital gains provisions represent "an exception from the normal tax requirements of the Internal Revenue Code, the definition of capital asset must be narrowly applied" in order "to effectuate the basic congressional purpose." Corn Products Refining Co. v. Commissioner, 350 U.S. 46, 52 (1955(). In resolving this question, courts have utilized several well recognized tests in determining the purpose for which the property was held at the time of sale. These tests include: (1) The purpose for which the asset was acquired; (2) the frequency, continuity, and size of sales; (3) the activities of the seller in the improvement and disposition of the property; (4) the extent of improvements made to the property; *128 (5) the proximity of sale to purchase; and (6) the purpose for which the property was held during the taxable years. William B. Howell, supra (at p. 554). Due consideration of all these factors is necessary; no single factor is conclusive. W. T. Thrift, Sr., supra.The facts indicate that J & D engaged in the business of purchasing unimproved land, developing it, and selling the land for single-family residential construction. This description of petitioner's business includes, as a matter of course, the buying and selling of realty. It is well established, however, that a taxpayer engaged in a real estate business may hold a portion of his real property for investment purposes. Maddux Construction Co., 54 T.C. 1278 (1970); Eline Realty Co., 35 T.C. 1 (1960). 2After having carefully considered the facts we must conclude that J & D held the Hillendale property for investment purposes from the time of its purchase until it entered into the contract of sale with Rieder-Haas. In arriving at this conclusion, we have been impressed with the*129 activities of J & D prior to the sale which were fully consistent with the purpose, as expressed by petitioner, to construct and rent apartments on the Hillendale tract. While we are mindful that certain of the activities were also consistent with the development of the property for later sale, we note that several of the actions taken by J & D in regard to the land were only consistent with the construction of apartments. For example, the inquiry into possible financing, the examination of apartment types, and the test borings were essential steps directed solely toward apartment construction. The extent of petitioner's activities with regard to the Hillendale property might not, under other circumstances, be sufficient to show an investment intent. However, the measures taken by J & D assume special import in light of the fact that proper zoning for apartment units (R-4) was obtained only eight days prior to the original offer of purchase from Rieder-Haas. Only after the Levy Court granted rezoning on March 29, 1966, would it have been reasonable for J & D to have pursued further construction activity. The absence of any sales or promotional efforts by the petitioner in disposing*130 of the Hillendale tract further supports our determination. See Maddux Construction Co., supra; Eline Realty Co., supra.J & D did not solicit buyers, list the property with real estate brokers, place a "For Sale" sign upon the property nor authorize anyone to act in its behalf to seek a buyer. The only contact that J & D had with any party in regard to the purchase prior to receiving an offer was a request by Steffenberg for permission to show the property. Such action by itself does not constitute sales activity by J & D. The conversation between Miller and Steffenberg, a few days prior to the zoning approval, was brief and incidental to Miller's primary purpose in visiting Steffenberg's office. While there exists some doubt as to exactly what was said during this conversation, we are convinced that Steffenberg inferred more from Miller's comments than was intended. Because Steffenberg had been trying to secure suitable property for the eventual buyer, Rieder-Haas, it appears that Steffenberg promptly initiated discussions with Unterberger, the representative of Rieder-Haas, without the encouragement or express authority of J & D. The history of*131 the petitioner's corporate life, and that of related corporations, indicates to us that if J & D had earnestly wanted to sell the Hillendale property, Rappa, not Miller, would have made the arrangements and conducted the negotiations. Respondent has raised two alternative arguments. Because we have found the petitioner's investment intent remained constant from the time of purchase until the sale of the subject property, we need not consider respondent's "change of purpose" argument. Similarly, we find respondent's other argument not supported by the facts and, therefore, without merit. After reviewing the evidence in this case, we hold that J & D purchased the Hillendale property for investment purposes and continued to hold the property for the construction of apartments until it received an unsolicited offer to purchase from Rieder-Haas. Accordingly, the Hillendale property was a capital asset held by J & D and the gain recognized on its sale is taxable as capital gain. Decision will be entered for the petitioner. Footnotes1. All references are to the Internal Revenue Code of 1954, as amended. SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include--(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; ↩2. See also, Edwards Industries, Inc., T.C. Memo 1974-120↩ (May 9, 1974).